THE CHICAGO UNION TRACTION COMPANY

*v.*

THE CITY OF CHICAGO.*

*Opinion filed October 25, 1902—Rehearing denied December 16, 1902.*

1. STREET RAILWAYS—*duty to give transfer tickets is a public duty.*
The duty to give transfer tickets, imposed by section 1723 of the
Revised Code of Chicago, is one which arises out of the public
character of the business of street railway companies; and this
duty rests not merely upon the technical owner, but upon the real
or beneficial owner of the lines of street railway.

2. SAME—*corporate forms and fictions cannot be used to evade public
duties.* In determining the duty of a public service corporation to
the public the substance of things will be looked to, and considera-
tion will not be given to corporate forms and fictions.

3. SAME—*when section 1723 applies although corporations are sepa-
rate legal entities.* Section 1723 of the Revised Code of Chicago, in
so far as it requires transfers to be given where any street rail-
way owned, operated or leased by any person, firm or corporation
connects with or comes within two hundred feet of any other street
railway owned, leased or operated by the same person, firm or
corporation, applies to a case where one corporation is the legal
owner of one line and beneficial owner of another, even though
legal title to the latter line may be in another corporation.

4. SAME—*Chicago Union Traction Company and Chicago Consolidated
Traction Company must exchange transfers.* The Chicago Consolidated
Traction Company bears such a relation to the Chicago Union
Traction Company as to be regarded as the "same corporation,"
within the meaning of the language used in section 1723 of the Re-
vised Code of Chicago, in so far as transfer tickets are concerned.

5. SAME—*rate of fare prescribed by ordinance is presumed to be reason-
able.* The rate of fare prescribed in section 1723 of the Revised
Code of Chicago will be presumed to be reasonable until its un-
reasonableness is shown, and the burden of proving such unrea-
sonableness is upon the party asserting it.

6. SAME—*public service corporation is entitled to profit on actual invest-
ment only.* A public service corporation, such as a street railway
company, is entitled, at the most, only to a profit on its actual in-
vestment, and the fact that it is not permitted to charge enough
to pay interest on all its outstanding obligations and a dividend
upon all stock, in addition to operating expenses, does not deprive

*With this case are decided seven other cases of the same title,
being Nos. 2649, 2650, 2651, 2652, 2654, 2655 and 2656.

it of its property without due process of law nor deny it the equal protection of the laws.

7. SAME—*basis of calculation as to reasonableness of rates is the fair value of the property.* The basis for calculating the reasonableness or unreasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction is the fair value of the property used by it for the convenience of the public; and the apparent value of the property and franchises, as represented by stocks, bonds and obligations, is not alone to be considered.

8. SAME—*one method of showing reasonableness of rates.* One method of determining what is a reasonable rate for transportation is to show that other companies of a similar character charge the same rate for transportation for the same or longer distances.

9. SAME—*what must be proven to present claim that rate is unreasonable.* A street railway company desiring to present the question whether an ordinance fixing rates of fare and providing for transfers is unreasonable, must show the profits and earnings of its entire system and the effect which the enforcement of the ordinance will have upon such system.

APPEAL from the Criminal Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

Eight actions were brought by appellee, the city of Chicago, against appellant, the Chicago Union Traction Company, before a justice of the peace of that city in December, 1901, to recover penalties for the refusal by appellant to give to passengers on certain of its street car lines transfer tickets, entitling such passengers to rides without additional fare upon other street car lines, embraced within the system, or corporation, known as the Chicago Consolidated Traction Company, the lines so embraced within the Chicago Consolidated Traction Company being owned, leased, or operated by the appellant, according to the contention of the appellee, the contrary, however, being claimed by the appellant. The eight actions thus brought, together with the judgments rendered therein, have been consolidated, and taken by this court as one case, inasmuch as the same questions are involved in all the cases. The actions are all based upon sections 1723 and 1725 of the Revised Code of Chi-

cago, being an ordinance passed by the common council of that city on June 26, 1890, and re-enacted as a part of the Revised Code of the city on April 8, 1897.

Judgments were entered before the justice in favor of the city and against appellant, each for $50.00 and costs. From these judgments appeals were perfected to the criminal court of Cook county. Upon the trial of each of the eight cases in the criminal court of Cook county, appellant moved the court, at the close of the evidence, that judgment be entered in its favor, upon the alleged ground that said sections 1723 and 1725 impaired the obligation of the contract between the city and the appellant, and upon the ground that said sections deprived appellant of its property without due process of law, and denied to it the equal protection of the laws. The court overruled the motion in each case, to which rulings appellant then and there excepted. Appellant then moved the court in each case that judgment be entered for it upon the ground that the evidence did not sustain the charge against it. The court overruled the motion in each case and the appellant then and there duly excepted. Thereupon, appellee and appellant, plaintiff and defendant in the trials below, submitted to the court certain propositions of law. The propositions, so submitted by the appellee, were held by the court to be correct propositions, but the propositions, submitted by the appellant, were refused by the court, and exception was duly taken to this action. The cases having been submitted by agreement of parties for trial before the court without a jury, the court found the issues for the plaintiff, and entered judgment against appellant in each case for $50.00 and costs, to which exception was duly taken. The propositions of law, held and refused by the court, are set forth in *Chicago Union Traction Co.* v. *City of Chicago,* (*ante,* p. 484,) being three other suits between the same parties, based upon the same sections of the Revised Code of Chicago. The present appeals are prosecuted from

the eight judgments, so entered by the criminal court of Cook county against the appellant.

GWYNN GARNETT, (W. W. GURLEY, of counsel,) for appellant:

Section 1723 of the Municipal Code of Chicago provides that free transfer slips shall be given from any lines of street railroad company to other lines owned, leased or operated by such company. If appellant does not own, lease or operate the lines of the Consolidated Traction Company there is no basis for these actions.

If all that is claimed by appellee in the case be true, it amounts merely to this: that appellant, by voting a majority of the shares of the Chicago Consolidated Traction Company, can elect a board of directors of that company which will so govern the affairs of that road that its operation shall not be hostile to the interests of appellant. Should it be granted that appellant's power to vote the majority of the shares of stock of the Consolidated Traction Company gives it a control of the corporation known as the Chicago Consolidated Traction Company, this does not mean that appellant either owns, leases or operates the lines of street railway belonging to that company. There is a broad and well defined distinction between the control of a corporation through its board of directors and officers, and the control and operation of the lines of railway owned by such corporation. If this distinction be not sound, it must be true that an individual who owns enough stock in a railroad corporation to elect a majority of the directors is the operator of the road. The distinction, however, is sound and is thoroughly established. It has been held in a large number of cases that no matter how potent may be an outside influence, such as voting power, upon the officers and directors of a corporation, nevertheless the actual operation of a corporation is conducted, in fact and in law, by its officers and its board of directors. So, as the

phrase appears in the cases, the stockholders control the directors but the directors control the road. *Pullman Car Co.* v. *Railroad Co.* 115 U. S. 596; *Higgins* v. *Lansingh,* 154 Ill. 355; *People* v. *Telephone Co.* 22 N. E. Rep. 1057; 117 N. Y. 241; *United States* v. *Telephone Co.* 29 Fed. Rep. 17; *Jessup* v. *Railroad Co.* 36 id. 735; *Railroad Co.* v. *Cochran,* 43 Kan. 225; *Railroad Co.* v. *Davis,* 34 id. 199; *White* v. *Pecos Land Co.* 18 Tex. Civ. App. 634; *Railroad Co.* v. *Railroad Co.* 136 U. S. 356; *Exchange Bank* v. *Construction Co.* 91 Ga. 1; *Farnum* v. *Blackstone,* 1 Sumner, 46.

Neither in equity nor at law does control of the officers and directors of a corporation, and of the corporation itself, through its directors and officers, amount to operation or control of the properties of the corporation.

Even where companies lose their identity by consolidation, the rights of both as to rates of fare pass to the new corporation. *Railroad Co.* v. *Memphis,* 53 Fed. Rep. 715; *Africa* v. *Board,* 70 id. 738; *Mayor* v. *Railroad Co.* 31 Atl. Rep. 238; *Tennessee* v. *Whitworth,* 117 U. S. 145.

CHARLES M. WALKER, Corporation Counsel, HENRY SCHOFIELD, and CLARENCE N. GOODWIN, for appellee.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

As will appear by reference to the case of *Chicago Union Traction Co.* v. *City of Chicago,* (*ante,* p. 484,) the North Chicago City Railway Company was organized by special charter on February 14, 1859, and the Chicago West Division Railway Company was organized by special charter on February 21, 1861. The street railroads in the north and west divisions of the city were operated by these two railway companies until 1886 in the north division of the city, and until 1888 or 1889 in the west division of the city. About the year 1886, the North Chicago Street Railroad Company was organized under the general Incorporation law of this State, when, as is

claimed by appellant, the North Chicago City Railway Company leased its property to the North Chicago Street Railroad Company. The latter company continued to operate its lines until about July 1, 1899, when, as is claimed by the appellant, the North Chicago Street Railroad Company leased its properties to the appellant. About the year 1888 or 1889, as is claimed by the appellant, the Chicago West Division Railway Company executed a lease of its properties to the West Chicago Street Railroad Company, and the latter company operated its lines until they were leased on July 1, 1899, to the appellant, as will appear by reference to the case of *Chicago Union Traction Co.* v. *City of Chicago*, (*ante*, p. 484).

While the North Chicago Street Railroad Company and the West Chicago Street Railroad Company were engaged in the operation of street railway lines, various companies were organized in the north and west and north-east and north-west portions of the city as feeders to, or extensions of, the North Chicago Street Railroad Company and the West Chicago Street Railroad Company. The companies so organized were seven or eight in number, and will be mentioned hereafter. On or about February 27, 1899, they passed into the hands of the Chicago Consolidated Traction Company, a corporation organized under the general Incorporation act of this State on January 28, 1899. The appellant contends that it was not obliged to furnish transfer tickets under and in obedience to section 1723 of the Revised Code of Chicago to passengers, passing from any one of the lines, which it admits itself to be the owner of, to any one of the lines, constituting the Chicago Consolidated Traction Company, or from any one of the latter lines to any one of the lines, which it admits itself to be the owner of.

So far as any of the questions, involved in the case of *Chicago Union Traction Co.* v. *City of Chicago*, (*ante*, p. 484,) apply to the facts of the eight cases now under consideration, they have been already sufficiently discussed in

the opinion in the last named case, and such discussion will not be here repeated. There are only two questions, involved in the present cases, in addition to the questions already decided in the other case, which disposed of three actions, based upon the same sections of the Revised Code of the city. The first of these questions is, whether the Chicago Consolidated Traction Company bears such a relation to the appellant company, as to make the two companies come within the purview and meaning of section 1723, so far as transfer tickets are concerned. Under this branch of the case, appellant claims that it was justified in refusing the transfer tickets, upon the ground that it does not own, lease or operate or run the cars from which, or to which, as the case may be in each action, transfers were demanded and refused, but that said cars are owned, operated and run by another company, distinct and separate from the appellant, to-wit, the Chicago Consolidated Traction Company. On the other hand, the appellee claims that the organization known as the Chicago Consolidated Traction Company is a mere "dummy;" that, if it has any legal existence at all, it is only on sufferance by the appellant, the Chicago Union Traction Company; that it is suffered to continue to preserve its technical legal existence only to subserve private interests, and not to subserve any public interest, nor to perform the public duties imposed upon it by the State when the State created it; that its duties to the public have been usurped and are being performed by the Chicago Union Traction Company; that the latter has absolute control, *de facto*, of all the property of which said Consolidated company may have a dry, technical, legal title; in a word, that, *de facto*, the Chicago Union Traction Company owns, operates and runs the cars for the conveyance of passengers over all the lines of street railway in the city of Chicago, which, for purposes of its own, it chooses to operate under the masque of the name of the said fictitious

Chicago Consolidated Traction Company; that the facts in the record must be viewed and examined, not from the point of view of a creditor or stockholder, in privity with the fictitious entity known as the Chicago Consolidated Traction Company, but from the point of view of the public to whom appellant owes great and important duties, the faithful performance of which is, in contemplation of law at least, appellant's guiding thought; that the city council has the power to deal with facts within the limits of its jurisdiction as it finds them, whatever may be the legal rights of the State, of stockholders, or creditors; that one corporation may be, *de facto,* running and operating a line of street railway in the city of Chicago, although the title to that property may be *de jure* in another corporation.

The second question involved in this case is, whether the effect of the ordinance known as sections 1723 and 1725, if enforced over both the lines of appellant and the lines of the so-called Chicago Consolidated Traction Company as one system of railway, will be to so cut into the earnings of appellant as to constitute a taking of its property. Under this branch of the case the appellant contends that the ordinance if enforced, as has been done in these eight cases, will deprive it of its property without due process of law, upon the alleged ground that the maximum rate of fare, fixed in the ordinance at five cents for a continuous trip, is unreasonable; that is to say, that its practical operation and effect will be to so cut into the earnings of the company, that there will be not only no profit for the stockholders, but an actual loss.

*First*—So far as section 1723 of the Revised Code of Chicago, passed by the common council on April 8, 1897, fixes the maximum rate of fare to be charged by street railroad companies within the limits of the city at five cents for each passenger over twelve years of age, and half fare for each passenger over seven and under twelve years of age, for one continuous trip, its validity is not

here involved, but has been passed upon in the other case. The second clause of section 1723 provides that "at any point where any line of any street railway owned, leased or operated by any person, firm or corporation does now or shall hereafter, within the limits of the city of Chicago, join, connect with, cross, intersect or come within a distance of two hundred feet of any other line of street railway owned, leased or operated by the same person, firm, company or corporation, any passenger who shall have paid his fare on any street car or other vehicles run or operated on such first mentioned line shall, on his request, be entitled to demand and receive from the person or persons in charge of such street car or other vehicle upon which he has so paid his fare a transfer ticket, which transfer ticket shall entitle such passenger, without further charge, to be carried on any other one line adjoining, connecting, crossing and intersecting, as aforesaid, and owned, leased or operated by such person, firm or corporation, for a continuous trip of any distance within the limits of the city of Chicago, if used within one hour after the same is issued at the point or place for which such transfer ticket was issued." The contention of appellant here is, that it does not own, lease or operate the lines of the Chicago Consolidated Traction Company in any such sense, as to subject it to the requirements above set forth of section 1723.

In order to determine the question, whether or not the lines of the so-called Chicago Consolidated Traction Company are owned, leased or operated by appellant, the Chicago Union Traction Company, it will be necessary to review the history of the various companies leading up to the organizations, known as the Chicago Consolidated Traction Company and the Chicago Union Traction Company.

By the original charters of 1859 and 1861, as they appear in the other case, the North Chicago City Railway Company and the Chicago West Division Railway Com-

pany were authorized to extend their several railways to any point or points within the county of Cook. They were also authorized, with the assent of the supervisor of any township, to lay down and maintain their railways along any common highway in such township. Presumably, the power thus to extend their railways passed to their alleged lessees, the North Chicago Street Railroad Company and the West Chicago Street Railroad Company. The latter companies, however, did not pursue the policy of extending their roads in the manner contemplated by the original charters. That is to say, such extensions were not effected under the name of extensions, but were accomplished in another way in the manner hereinafter stated. Instead of extending their lines, these corporations were largely instrumental in the organization of other companies, which connected with their own lines at their respective northern and western termini, and acted as feeders to their business.

Under the original charters of 1859 and 1861, and the ordinances of 1858 and 1859, referred to in the other case, and relied upon by appellant as constituting its charter, the original companies, and their lessees, the North Chicago Street Railroad Company and the West Chicago Street Railroad Company, could only charge a maximum rate of fare, not exceeding five cents, for any distance to which their lines should be extended under the acts of 1859 and 1861. But by the organization of separate companies, whose car lines were not technically extensions of the original lines, though, by reason of their connections with the same, they were practically operated as such extensions, the public could be forced to pay a separate fare of five cents upon each of the separate lines, operated by the companies so organized. Whether, as is claimed by the appellee, such separate companies were organized for the express purpose of making the public pay several fares of five cents, instead of one fare of five cents, it is not necessary here to inquire. It is suf-

ficient to say that such was the effect of the action taken, if it was not, as a matter of fact, the intended effect.

1. On February 15, 1889, a corporation known as "The Cicero and Proviso Street Railway Company" was organized under the general Incorporation act of the State. The object of its formation is stated in the statement, accompanying its certificate of organization, to be the construction, purchase, maintenance and operation of street railways with one or more tracks and the necessary and convenient side-tracks, turn-outs and other structures and fixtures appurtenant thereto, in the territory embraced in the towns of Cicero, Proviso and Jefferson in Cook county, such railways to be operated by horse power, or by electrical device, or by any other proper or convenient system of cables, or by any other approved motive power, except steam locomotive, etc. The statement recites that the capital stock shall be $250,000.00; that the number of shares shall be 2500, and the amount of each share $100.00, and that the location of the principal office is in Chicago. Soon after the organization of the Cicero and Proviso Street Railway Company, to-wit, on August 5, 1890, a contract was made between the West Chicago Street Railroad Company and the Cicero and Proviso Street Railway Company, wherein the West Chicago company granted to the Cicero company permission to run its cars over certain portions of the tracks of the West Chicago company, and the Cicero company agreed to encourage the transfer of passengers from its cars to the cars, belonging to the West Chicago company, and in every way to do such things, and act in such manner, as to encourage the business of the West Chicago company. This agreement recites that the Cicero company was about to build a street railway on certain streets, so that the agreement was entered into before the actual completion of its line of railway.

From the terms of an agreement, dated March 29, 1899, and hereinafter referred to, it appears that the West Chi-

cago Street Railroad Company held notes against the
Cicero and Proviso Street Railway Company, and two
other suburban companies hereinafter mentioned, to-wit,
the Ogden Street Railway Company and the Chicago and
Jefferson Urban Transit Company, for a large amount,
certainly not less than $175,160.00.  The proof shows that
the lines of this Cicero and Proviso company were built
simply as feeders to the West Chicago Street Railroad
Company, and it is a fair inference from all the facts de-
veloped by the testimony, that money was advanced by
the West Chicago Street Railroad Company for the con-
struction of the lines of the Cicero and Proviso Street
Railway Company.   It is inconceivable for what other
purpose these notes could have been held by the one
company against the other, unless such notes represented
money advanced for construction purposes.   On May 21,
1896, the Cicero and Proviso Street Railway Company
executed a lease to the West Chicago Street Railroad
Company, by the terms of which the latter company, for
a period of fifty years, was to take charge of, manage and
operate all the cars of the said Cicero railway company.
This lease or operating agreement was in force between
the two companies up to February 24, 1899.  Under it the
West Chicago Street Railroad Company was entitled to
receive, and take charge of, all receipts derived from the
management and operation of the Cicero railway; and
the Cicero company was to issue its bonds, secured by
mortgage, to pay the street railroad company for im-
provements and betterments to be made by the street
railroad company for the Cicero railway company.  There-
by, also, the street railroad company agreed to guarantee
the payment of the principal and interest on all bonds,
issued by the Cicero railway company.  How many of
these bonds of the Cicero company were actually guar-
anteed by the West Chicago Street Railroad Company
does not clearly appear, but the evidence shows that
there were consolidated mortgage bonds of the Cicero

and Proviso Street Railway Company to the amount of $1,908,000.00, and first mortgage bonds of said company to the amount of $78,000.00.

2. On October 8, 1890, another corporation was organized, called "The Chicago and Jefferson Urban Transit Company," under the general Incorporation law of the State with a capital stock of $1,000,000.00, 10,000 shares, each share of $100.00, formed for the express object of building and operating lines of street railway in the city of Chicago and neighboring towns, to be run by electric or other motive power. This corporation was organized as a feeder to the West Chicago Street Railroad Company. On November 27, 1895, it entered into an agreement with the latter company, by the terms of which the Jefferson company granted to the West Chicago company the use of all its tracks, then laid or thereafter to be laid, for the purpose of operating thereon the cars of the West Chicago Street Railroad Company, and the Jefferson company was granted the right to use, for the purpose of completing a route, any tracks of the West Chicago company upon certain terms. Under the agreement, the West Chicago company was to furnish electric power to the Jefferson company, and therein and thereby the West Chicago Street Railroad Company agree to guarantee all the bonds, which the Chicago and Jefferson Urban Transit Company might issue, provided that such issue should not exceed in amount the actual cost of constructing the road, and equipping the same and any extensions or additions thereto. Therein, the Jefferson company also agreed that, in case the West Chicago company should be obliged to pay anything on account of its guarantee of such bonds, the amounts so paid should be a lien upon the property of the Jefferson company, and the latter company agreed to confess judgment in double the amount of money, paid by the West Chicago company, on account of such default. The proof shows that there are bonds of the Chicago and Jefferson

Urban Transit Company to the amount of $208,000.00, and, besides the guarantee of the bonds already mentioned, the West Chicago company held notes for large amounts against the Jefferson company, as already stated. The Chicago and Jefferson Urban Transit Company was organized and its tracks were built as feeders to the West Chicago Street Railroad Company. The Jefferson company's lines started at one line of the West Chicago company, and crossed other lines of the West Chicago company. It should also be observed, that the Cicero and Proviso lines came near to points, where there were lines operated by the West Chicago Street Railroad Company. The agreement between the Jefferson company and the West Chicago Street Railroad Company also provides that, in case the Jefferson company should lay certain tracks in certain streets, "all construction for such extension shall be made under the direction and control of the party of the first part," that is, of the West Chicago Street Railroad Company. The books in evidence show that large expenses were incurred by the West Chicago Street Railroad Company on behalf of the Jefferson Urban company, and also that the West Chicago company acted as agent in the disbursement of the money for the Jefferson company, just as a bank would act for its customers. The expert accountant says in his testimony: "You cannot tell from the books whether the West Chicago handed that money over to the Jefferson and Urban, or whether they paid it out directly to the people to whom it was owing."

3. On October 1, 1891, another corporation was organized under the general Incorporation act of the State, by the name of "The Ogden Street Railway Company," with a capital stock of $2,000,000.00, the number of shares being 20,000, and the amount of each share $100.00, formed, as set forth in the statement, for the construction, purchase, maintenance and operation of street railways, etc., in Cook, DuPage and Kane counties. The lines of

the Ogden Street Railway Company were built as feeders
to the West Chicago Street Railroad Company.   As has
already been stated, the West Chicago Street Railroad
Company on March 29, 1899, held notes against this
Ogden Street Railway Company.   On May 21, 1896, the
Ogden Street Railway Company executed a lease to the
West Chicago Street Railroad Company, similar in terms
to the lease executed by the Cicero and Proviso Street
Railway Company to the West Chicago Street Railroad
Company.   By the terms of the lease, the West Chicago
Street Railroad Company was, for a period of fifty years,
to take charge of, manage and operate all the cars of
the Ogden Railway Company and make all necessary re-
pairs, and pay for improvements to be made, and use the
tracks of the Ogden Street Railway Company, and pay
all claims for injuries suffered by parties traveling on the
Ogden company's lines, and control the property of the
Ogden Railway Company, and receive and take charge
of all the receipts, derived from the management and op-
eration of the Ogden railway.   By the terms of the lease
or agreement, the Ogden Railway Company was to issue
its bonds to pay the West Chicago Street Railroad Com-
pany the cost of improvements made by it; and the
West Chicago Street Railroad Company also agreed to
guarantee the payment at maturity of the principal and
interest on all the bonds, issued by the said Ogden Rail-
way Company, such guaranty to be endorsed on said
bonds.   This agreement was in force up to February
24, 1899.   The proof shows that the bonds of the Ogden
Street Railway Company amount to $750,000.00.   The West
Chicago Street Railroad Company acted as collecting
agent or banker for the Ogden Street Railway Company,
and the receipts of the latter were actually received and
disbursed by the West Chicago Street Railroad Company.
The Ogden company turned over all its receipts to the
West Chicago Street Railroad Company.   On August 4,
1896, an agreement was entered into between the North

Chicago Street Railroad Company and the West Chicago Street Railroad Company, the Chicago and Jefferson Urban Transit Company, the Cicero and Proviso Street Railway Company, the Ogden Street Railway Company and the North Side Electric Street Railway Company, hereafter mentioned, by the terms of which these companies agreed that, for the purpose of completing a route or making a terminal, each company might make use of the tracks of the other, or any of them, for the operation of its cars. It also appears that on August 4, 1896, one George A. Yuille was second vice-president of the West Chicago Street Railroad Company and at the same time president of the Cicero and Proviso Street Railway Company.

4. On February 28, 1893, another corporation was organized under the general Incorporation act of the State, called "The North Side Electric Street Railway Company," with a capital stock of $500,000.00, the number of shares being 5000, and the amount of each share being $100.00, and the object of its formation being the construction, equipment and maintenance of a system of railways in the city of Chicago. The duration of the corporation was to be ninety-nine years. This corporation was a party to the agreement above mentioned, dated August 4, 1896. On October 1, 1895, an agreement was made between this North Side Electric Street Railway Company as party of the first part, and the North Chicago Street Railroad Company as party of the second part, by the terms of which the first party agrees that the second party shall have the right to use any and all of the tracks of the first party, then built or thereafter to be built, for the purpose of operating thereon the trains and cars of the second party, and the second party agrees to furnish to the first party electricity necessary to propel and heat and light its cars, and the second party agrees to permit the first party to use the tracks of the second party to operate its cars on, for the pur-

pose of making connections and for terminal facilities. The contract was to endure for fifty years.  On December 10, 1895, another contract was made between the North Side Electric Street Railway Company, party of the first part, and the North Chicago Street Railroad Company, party of the second part, by the terms of which the party of the second part agreed to guarantee the bonds of the party of the first part, and the first party granted unto the second party the right to use any part of its tracks free of charge, and to purchase from the second party the electricity required to furnish motive power, light and heat for the operation of its cars, etc.  The bonds of the North Side Electric Street Railway Company are $155,000.00.  The lines of the North Side Electric Street Railway Company extended north and north-west, and at certain points connected with the lines of the North Chicago Street Railroad Company.

5. On May 9, 1893, another corporation was organized under the general Incorporation act of the State, known as "The Chicago Electric Transit Company" with a capital stock of $1,500,000.00, the amount of each share being $100.00 and the number of shares 15,000, and the object of its organization being stated to be to locate and from time to time, alter, change or re-locate, construct, re-construct, purchase, lease or otherwise acquire, maintain and operate, and to lease to others to operate, with steam, or animal, or cable power, or electric, gas or compressed air motive power, street railroads with one or more tracks laid down upon streets, alleys, highways or such other lands as it may acquire by purchase, condemnation or otherwise in the city of Chicago and territory adjoining thereto within Cook county.  On November 12, 1894, the Chicago Electric Transit Company as first party, and the West Chicago Street Railroad Company as second party, made an agreement, in and by the terms of which the first party agreed to connect at its south-eastern terminus with, and deliver its passengers to, the

lines of second party, its successors and assigns, during the life of its ordinance rights on Elston avenue, and second party agreed that, during the life of its franchises on Milwaukee avenue, it would take up the passengers of first party so delivered to it at the points of connection of the lines of said parties thereto, and transport them southward over its lines, and in consideration thereof the West Chicago Street Railroad Company guaranteed the bonds of the Chicago Electric Transit Company. It was provided in said agreement that nothing should be taken to prevent each party thereto from charging a full fare for each passenger on the respective lines of each.   The bonds of the Chicago Electric Transit Company are $1,097,000.00.   On January 1, 1895, an agreement was made between the West Chicago Street Railroad Company as first party, and the Chicago Electric Transit Company as second party, by which second party agreed to furnish to first party the electric current with which to operate its cars.   On the same day, to-wit, January 1, 1895, an agreement was made between the North Chicago Street Railroad Company as first party, and the Chicago Electric Transit Company, as second party, of a similar nature to the contract already referred to of the same date.   Electric current was to be conveyed to the lines of one party by feeder wires, connecting with the power station of the other party.   On July 16, 1895, another agreement was made between the Chicago Electric Transit Company as first party, and the North Chicago Street Railroad Company as second party, wherein second party guaranteed the principal and interest of $150,000.00 of the first mortgage bonds of the first party, issued for the construction and equipment of the Belmont avenue line of the first party, and first party agreed, during the life of its rights on certain streets and avenues, to connect with the north and south lines of the second party at the points where said north and south lines intersect said Belmont avenue line, and, at the points of intersection,

to deliver passengers to said north and south lines of second party for transfer north and south, said first party agreeing to operate and carry on its Belmont avenue line in such manner, as to increase and develop the north and south traffic of said second party;. and said second party agreed to take up the first party's passengers delivered to it at said points of intersection, and transport them northward and southward over the lines of said second party. Nothing in the contract was to be taken to prevent either party from charging a full fare on each of their respective lines. On January 17, 1896, another agreement was made between the West Chicago Street Railroad Company as first party, and the Chicago Electric Transit Company as second party, by the terms of which the first party agreed to permit the second party to operate its cars over the tracks, owned and operated by the first party on certain streets and avenues, and it was agreed that the cars of the first party should not be restricted to any particular lines of the second party, but might run over any part of the tracks of said second party. On December 12, 1896, another agreement was entered into between the Chicago Electric Transit Company as first party, and the North Chicago Street Railroad Company as second party, by the terms of which the second party agreed to guarantee the principal and interest on $68,000.00 of the first mortgage bonds of the first party, issued for the construction and equipment of the Irving Park Boulevard line of first party, and, in consideration thereof, the first party agreed to connect with the north and south lines of the street railroad of the second party at certain intersecting points, and to deliver passengers to the north and south lines of second party for transfer north and south, the announced intention being that the first party would, so far as it reasonably could, operate and carry on its said boulevard line in such manner, as to increase and develop the north and south traffic of said second party, and the second party

agreed to take up the passengers of the first party, delivered to it at such points of intersection, and transport them northward and southward over the lines of second party, it being understood that nothing should forbid each party from charging a full fare for each passenger on their respective lines. On December 14, 1896, another agreement was made between the Chicago Electric Transit Company as first party, and the West Chicago Street Railroad Company as second party, by which the second party agreed to guarantee the principal and interest of $68,000.00 of the first mortgage bonds of the first party, issued for the construction and equipment of said Irving Park Boulevard line of the first party. The agreement contains similar provisions as to connections with the north and south lines of the second party, and the delivering of passengers, etc., and the charging of full fare for each passenger, and the increasing and developing of the north and south traffic of said second party, as are contained in the other agreement above mentioned dated December 12, 1896. On November 1, 1897, another agreement was made between the Chicago Electric Transit Company as first party, and the West Chicago Street Railroad Company as second party, whereby the second party agreed to guarantee the principal and interest of $37,000.00 of the first mortgage bonds of the first party for the construction and equipment of the Fortieth street line of railroad of the first party, and the same agreements between the two parties in regard to the connection with the north and south lines, and the delivery of passengers, and the development of the business, and the charging of full fare, were made as are embodied in the other agreement above set forth, dated December 14, 1896. In the language of one of the witnesses, the lines of the Chicago Electric Transit Company "dovetailed onto the lines of the West Chicago Street Railroad Company."

6. On June 19, 1893, another corporation was organized under the general Incorporation act of the State

under the name of "The North Chicago Electric Railway Company" with a capital stock of $2,000,000.00, the number of shares being 20,000, and the amount of each share being $100.00, the object of the formation of which is stated to be to construct, lease, purchase or otherwise acquire horse, dummy and street railroads in Chicago and adjoining territory in Cook county, and to maintain and operate the same. On March 22, 1894, an agreement was made between the North Chicago Electric Railway Company, as first party, and the Chicago West Division Railway Company and the West Chicago Street Railroad Company, as second parties, wherein the parties granted to each other the right and privilege of using their respective tracks where the same connected with each other, and to use and operate their cars along and upon the tracks of each other between certain points. Therein the first party agreed to propel the cars of the second parties from its connection with the cable road at certain points, and to carry the passengers on such cars free of expense to said second parties for a maximum fare of five cents from the lines of one to the lines of the other. It was therein agreed that the electric railway therein named should be completed and in operation by the first party within one year from that date. On the same date, to-wit, March 22, 1894, another agreement was made between the North Chicago Electric Railway Company, as first party, and the North Chicago City Railway Company and the North Chicago Street Railroad Company, as second parties, reciting that the first party had been granted the right to lay and construct an electric railway on certain avenues and streets, and that the second parties were already owners of street railway tracks on certain streets, and agreements were therein made for the use of the tracks of the respective parties by each other, and for the connection of the tracks of one with the other, and for the right of each to use, operate and run its cars along and upon the

tracks of the other between certain points. The first party agreed to propel the cars of the second parties from the connection with their cable road at a certain point, and to carry passengers on certain cars for a maximum rate of five cents for a ride; and it was also agreed that the electric railway therein mentioned should be completed and in operation by the first party within one year from date. On October 19, 1894, another agreement was executed between the North Chicago Electric Railway Company as first party, and the North Chicago Street Railroad Company as second party, in regard to the furnishing of electric power by the railway company to the railroad company on certain streets and avenues, the contract to last for the term of twenty-five years. On November 12, 1894, another agreement was made between the North Chicago Electric Railway Company, as first party, and the West Chicago Street Railroad Company, as second party, whereby the second party agreed to guarantee the bonds of the first party, that day arranged for and agreed on, and the first party agreed to connect, during the life of its ordinance rights on Milwaukee avenue, at its south-eastern terminus with, and deliver its passengers to, the lines of the second party, its successors and assigns, and not to any other railway or lines. Second party therein agreed to take up the first party's passengers so delivered to it at the point of connection of the lines on said avenue of the parties thereto, and transport them southward over its lines. Nothing therein was to be taken to forbid or prevent each party from charging a full fare for each passenger on the respective lines of each. On November 12, 1894, another agreement of a similar nature was made between the North Chicago Electric Railway Company, as first party, and the North Chicago Street Railroad Company, as second party, by the terms of which the second party agreed to guarantee certain bonds of the first party that day arranged for and agreed on, and

the first party agreed to connect with certain lines of the second party, its successors and assigns, and deliver its passengers thereto, and the second party agreed to take up the passengers so delivered to it at the point of connection and transport them southward, each party being therein allowed to charge a full fare for each passenger. The bonds of the North Chicago Electric Railway Company are $868,000.00. On October 26, 1897, another agreement was made between the North Chicago Electric Railway Company as first party, and the North Chicago Street Railroad Company as second party, by the terms of which, in consideration of the guaranty by the second party of the principal and interest of $363,000.00 of the first mortgage bonds of the first party, issued for the construction and equipment of certain street lines of railroad of the first party, and that day arranged for and agreed upon, it was therein agreed that the first party would connect with the north and south lines of the street railroad of the second party at certain points of intersection, and would deliver passengers to said north and south lines of second party for transfer north and south, the intention being, as therein expressed, to develop and increase so far as possible the north and south traffic of the party of the second part, and the party of the second part agreed to take up such passengers delivered to it at the points of intersection and connection, and transport them northward and southward over its lines, nothing therein being taken to prevent each party from charging a full fare for each passenger on the respective lines of the parties. On June 21, 1898, another agreement was made between the North Chicago Electric Railway Company as first party, and the North Chicago Street Railroad Company as second party, by the terms of which, in consideration of the guaranty by the second party of the principal and interest of $47,000.00 of the first mortgage bonds of the first party, issued for the purpose of making payment for the completion of the

construction and equipment of street lines of railroad of the first party on certain streets, on that day arranged for and agreed on, it was agreed that the first party would make connections with the north and south lines of the railroad of the second party at certain points and deliver passengers to the north and south lines of the second party for transfer north and south, the expressed intent being to increase and develop the north and south traffic of said second party; and the second party also therein agreed to take up such passengers, so delivered to it at the points of intersection and connection, and transport them northward and southward over the lines of said second party, nothing therein being taken to prevent each party from charging a full fare for each passenger over their respective lines, etc.

7. On October 17, 1895, another corporation was organized under the general Incorporation act of the State under the name of "The Evanston Electric Railway Company," with a capital stock of $200,000.00, the number of shares being 2000, and the amount of each share $100.00, with the stated object of constructing, leasing, purchasing or otherwise acquiring horse, dummy and electric street railroads in Evanston and adjoining territory in Cook county, and maintaining and operating the same. On December 2, 1896, an agreement was made between the Evanston Electric Railway Company, first party, and the North Chicago Street Railroad Company as second party, by the terms of which, in consideration of the guaranty by the second party of the principal and interest of $100,000.00 of the first mortgage bonds of the first party, issued for the construction and equipment of its street railroad lines in Evanston, and that day arranged for and agreed upon, it was agreed that the first party would connect with the north and south lines of the second party at certain points, and deliver passengers to said lines for transfer north and south, so as, as much as possible, to increase and develop the north and south

traffic of said second party, and the second party agreed to take up such passengers at the points of intersection and transport them northward and southward over the lines of said second party, nothing therein contained being taken to prevent each party from charging a full fare for each passenger on their respective lines, etc.   The bonds of the Evanston Electric Railway Company are $130,000.00.

8. Another railroad company had been organized, known as "The Chicago North Shore Railway Company," which connected with the street railway line of the North Chicago Street Railroad Company at a certain point, but the record does not contain the certificate of organization of this company.   It does show, however, that, on May 10, 1894, an agreement was made between the North Shore Street Railway Company, as first party, and the North Chicago Street Railroad Company and the North Chicago City Railway Company, as second parties, by the terms of which the second parties granted permission to the first party to use, in conjunction with second parties, the tracks of the second parties located on certain streets and avenues, and to operate and run in conjunction with said second parties' the first party's cars along and upon said tracks between certain points, with electricity, and in consideration thereof the first party agreed to lay and construct a double track along certain streets.   By the terms thereof the first party agreed to haul, without cost or charge to the second party, a trailer car to be furnished by said second parties, and to be in charge of a conductor to be employed by second parties, no fare to be collected from passengers riding in said trailer car, etc.

9. The West Chicago Street Railroad Company and the North Chicago Street Railroad Company, successors to the Chicago West Division Railway Company and the North Chicago City Railway Company, built and extended their lines from the center of the city westward and

northward. It is apparent, that the street railway lines of the seven or eight companies heretofore mentioned, sometimes called in the record the "suburban lines," and sometimes the "lines of the underlying companies," were built as feeders to, and practically as extensions of, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company. They all constituted one system; and the suburban or extension railway companies, although technically separate organizations, were, as matter of fact, built under the direction of the original companies, and with the money of the latter, or with money obtained by the guaranties of the latter. The agreements, made between the original companies and the outlying companies, as soon as the latter were organized, or shortly thereafter, provide for the use of the tracks of the original companies by the outlying companies, and for the use of the tracks of the outlying companies by the original companies. They provide also for the connection of the lines of the outside companies with the lines of the original companies, and that the respective companies shall deliver and carry passengers for each other. Some of the agreements provide that each company shall charge a full fare for each passenger over their respective lines, and these amounted to a violation of the charters of the original companies, providing for a chârge of only five cents over their lines, when built or extended anywhere within the county of Cook. These agreements also show that the bonds, issued by the outlying companies for the purpose of raising money for the construction of their lines, were guaranteed by the West Chicago Street Railroad Company and the North Chicago Street Railroad Company. Although the organizations of these outlying companies were sought to be maintained to a certain extent as separate corporate entities, yet, as matter of fact, they were all constructed in the interest and under the direction of the original companies. If this was not so, what right had these original

companies to guarantee the bonds of the outlying companies? The right of one corporation to guarantee the contracts of another has been challenged by high authority. (*Pennsylvania Co.* v. *St. Louis, Alton, etc. Railroad Co.* 118 U. S. 315). The fact, that the bonds of these outlying companies were guaranteed by the original companies shows, that the former companies were but parts of the latter companies.

Now, what was the Chicago Union Traction Company, and what was the Chicago Consolidated Traction Company? The Chicago Union Traction Company consisted of the original companies, to-wit, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company. The West Chicago Street Railroad Company executed a lease to the Union Traction Company, which is in the record, and by the terms of which it surrendered to the Union Traction Company all its property, and all its rights, to be used and operated by the Chicago Union Traction Company, retaining only its corporate existence. While there is no lease in the record from the North Chicago Street Railroad Company to the Chicago Union Traction Company, yet it is claimed by the appellant that such lease was executed, and the recitals in several of the agreements and leases refer to such a lease as having been executed. The Chicago Union Traction Company was organized under the general law of the State on May 24, 1899. It was nothing more than a consolidation and union of the old companies, to-wit, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company.

The Chicago Consolidated Traction Company was organized under the general Incorporation act of the State on January 28, 1899. It was nothing more than a union or consolidation of the seven or eight suburban or outlying companies above mentioned, to-wit, the Cicero and Proviso Street Railway Company, the Chicago and Jefferson Urban Transit Company, the Ogden Street Rail-

way Company, the North Side Electric Street Railway Company, the Chicago Electric Transit Company, the North Chicago Electric Railway Company, and the Evanston Electric Railway Company, and perhaps one or two other companies. The Chicago Consolidated Traction Company claims to have purchased all the property and rights of these suburban companies, though exactly how the purchase was effected does not appear.

The Chicago Union Traction Company maintained the same relation after its organization towards these suburban or extension companies, which the West Chicago Street Railroad Company and the North Chicago Street Railroad Company had sustained before the organization of the Chicago Union Traction Company. The merging of the outlying companies into the Consolidated Traction Company did not change the relation of these companies to the Chicago Union Traction Company. In other words, after its organization, the Chicago Consolidated Traction Company bore to the Chicago Union Traction Company the same relation, which the seven or eight outlying companies bore to the West Chicago Street Railroad Company and the North Chicago Street Railroad Company. As the original companies substantially and in effect owned and operated the outlying companies before the merger of the original companies into the Chicago Union Traction Company, and before the merger of the outlying companies into the Chicago Consolidated Traction Company, so, after such mergers, the same relation of subordination and control existed on the part of the Chicago Union Traction Company over the Chicago Consolidated Traction Company.

In some of the agreements it is recited that the Chicago Consolidated Traction Company purchased all the suburban companies, and assumed all the liabilities of such companies, but there is nothing to show that it assumed or guaranteed the liabilities of the suburban companies, which it claims to have purchased, beyond a mere

recital to that effect in one or more of the agreements herein. On the contrary, after the Chicago Consolidated Traction Company was organized, and, according to its claim, had absorbed or purchased the suburban companies, the Union Traction Company guaranteed the bonds of these suburban companies. Mr. John M. Roach, the president of the Chicago Union Traction Company and also the president of the Chicago Consolidated Traction Company, says: "I believe the Union Traction Company have guaranteed every bond that has been issued by the underlying companies." Mr. F. E. Smith, auditor both of the Chicago Union Traction Company and of the Chicago Consolidated Traction Company, says: "The full amount of the bonds of the underlying companies guaranteed by the Union Traction Company is $5,194,000.00." The latter sum is the sum total of the bonds of the Cicero and Proviso Street Railway Company, the Ogden Street Railway Company, the Chicago and Jefferson Urban Transit Company, the North Chicago Electric Railway Company, the Chicago Electric Transit Company, the North Side Electric Street Railway Company, and the Evanston Electric Railway Company. As these bonds for the construction of the lines of the outlying companies were originally guaranteed by the West Chicago Street Railroad Company and by the North Chicago Street Railroad Company, so they were subsequently guaranteed by the Chicago Union Traction Company even after the organization of the Chicago Consolidated Traction Company, and the merger of the outlying companies into the latter company. The dominion of the original companies over the suburban companies in the manner shown by the agreements set forth, was exercised afterwards by the Chicago Union Traction Company, successor of the original companies, over the Chicago Consolidated Traction Company, successor of the outlying companies.

The history of the development of the railway system here involved shows, that the lines of the Chicago Con-

solidated Traction Company were built by the lessors of
the Chicago Union Traction Company, the North Chicago
Street Railroad Company and the West Chicago Street
Railroad Company, and, if not built directly by such les-
sor companies, they were built under the superintendence
of the latter, and with money raised upon bonds guaran-
teed by the latter, and as extensions of and feeders to
the lines of the latter. All the lines of the Chicago Con-
solidated Traction Company are operated for that pur-
pose to-day. The leases and agreements show that for
three years the lines of the west side, including the lines
of the Cicero and Proviso Street Railway Company, the
Chicago and Jefferson Urban Transit Company, and the
Ogden Street Railway Company, were operated, as mat-
ter of fact, by the lessor companies, although they were
apparently operated by the subordinate companies. The
ordinance, known as sections 1723 and 1725, was origi-
nally passed by the common council of the city of Chi-
cago on June 26, 1890, before the organization of most of
these subordinate companies. Whether the lessor com-
panies built and operated the extensions under the names
of these various subordinate companies for the purpose
of avoiding compliance with the terms of the ordinance,
is a matter that is not established by the evidence. But
the evidence shows that the existence of such separate
organizations made possible the collection of double fares
over the lines as extended.

*Second*—The second step in the formation of this sys-
tem of railways begins with the organization, under the
general Incorporation act, of the Chicago Consolidated
Traction Company on January 28, 1899. In the statement,
accompanying its certificate of organization, the object,
for which the Chicago Consolidated Traction Company
was formed, is stated to be "for the purpose of construct-
ing, maintaining and operating horse, dummy or street
railways within the city of Chicago and the county of
Cook," etc. Its capital stock is fixed at $15,000,000.00,

the number of shares being 150,000, and the amount of each share $100.00, the location of the principal office being in the city of Chicago.  The sum total of the capital stocks of the seven suburban companies above mentioned is $7,450,000.00.  The capital stock of the Chicago Consolidated Traction Company, to-wit, $15,000,000.00, is a little more than double the capital stock of the seven subordinate companies, which were merged into the Chicago Consolidated Traction Company.  Four persons subscribed, each for one share of the capital stock of the Chicago Consolidated Traction Company.  One Eugene Stewart subscribed for the remaining 149,996 shares, being $14,999,600.00.  The proof shows that "Eugene Stewart did not take up his subscriptions; those 149,996 shares were issued to the stockholders of the suburban companies of the Consolidated Traction Company."  The proof also shows that one Mr. Yerkes, who was at one time president of the West Chicago Street Railroad Company, and subsequently also president of the Chicago Consolidated Traction Company, was a large stockholder in the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, and also held about two-thirds of the stock of the Consolidated Traction Company.  The latter company claims to have purchased or bought out the seven suburban companies, but exactly how the purchase was made is not shown.  It does appear, however, that the Chicago Consolidated Traction Company has never built any line of its own, nor obtained any ordinance in Cook county from the common council of the city of Chicago.  As is said by Mr. Roach: "It got all its property of other companies."  It seems to be a fair conclusion from the evidence in this record, that the 149,996 shares of stock of the Chicago Consolidated Traction Company were turned over to the stockholders of the seven suburban companies in exchange for their stock.  No other explanation is given of the way, in which the Chicago Consolidated Traction Company came to be the

owner of all the property and rights of the subordinate companies. We pass no opinion upon the legality of this transaction, if it took place, nor upon the validity of any of the other transactions or organizations herein recited and mentioned, but merely state what the record shows, and what are fair inferences from the facts in the record.

There is testimony to the effect that 149,673½ shares of the stock of the Chicago Consolidated Traction Company were issued.   On March 29, 1899, an agreement was made between the Chicago Consolidated Traction Company, as first party, and the West Chicago Street Railroad Company, as second party.   This agreement refers to and recites an ordinance, passed by the board of trustees of the town of Cicero on December 19, 1898, by the terms of which ordinance the Ogden Street Railway Company agrees for a period of twenty years to sell twenty tickets for one dollar, entitling the legal holder to one continuous ride either way in one direction to or from any lawful stopping place on the lines of railway of the Ogden Street Railway Company, at or east of Austin avenue, from or to any lawful stopping place on the Ogden avenue line or the Madison street line east of Ogden avenue, or Randolph street line, or Twelfth street line east of Ogden line in the city of Chicago, of the West Chicago Street Railroad Company, without the payment of additional fare.   The ordinance also provides for a system of transfers to or from the respective railroads at the points of connection, so that the legal holder of each of such tickets shall be entitled to a continuous ride either way without the payment of additional fare and without change of cars, except at the point of transfer from the cars of the West Chicago Street Railroad Company to those of the Ogden Street Railway Company, etc.   This agreement recites that the Ogden Street Railway Company was indebted to the West Chicago company in a large sum of money; that the Consolidated company had made itself liable for the debts of the Ogden company,

and it was therein agreed that the Consolidated company should issue, or cause to be issued, 4379 shares of its capital stock fully paid and non-assessable to the said West Chicago company, and the said West Chicago company was to turn over and to deliver to the Consolidated company "the notes now held by the West Chicago company against the Ogden Street Railway Company, the Cicero and Proviso Street Railway Company and the Chicago and Jefferson Urban Transit Company, and all liability for the sum of $175,160.00 now found to be due and owing from said three companies last above named to the said West Chicago company on an accounting heretofore had." Therein also, the West Chicago company agreed to collect through its collectors all cash receipts or tickets collected by the conductors or employees of the Consolidated company, operating over such railroads in the town of Cicero, and connecting with the West Chicago company's lines, as may be requested of said West Chicago company by the Consolidated company from time to time. Therein also, the West Chicago company agreed to carry out and fulfill on its part the provisions of said ordinance, and to give all transfers therein spoken of.

These 4379 shares of Consolidated stock were handed over to the West Chicago Street Railroad Company. Afterwards all the property of the West Chicago Street Railroad Company was turned over to the Chicago Union Traction Company, the appellant herein. This being so, the 4379 shares of the stock of the Chicago Consolidated Traction Company also passed to the Chicago Union Traction Company, and the latter became the owner—if it could legally become such owner—of this amount of the stock of the Chicago Consolidated Traction Company. The notes, held by the West Chicago Street Railroad Company against the Cicero and Proviso Street Railway Company, the Chicago and Jefferson Urban Transit Company and the Ogden Street Railway Company, were given up and surrendered to the Chicago Consolidated Trac-

tion Company in return for, and as the consideration for, these 4379 shares of stock. These shares were transferred to the West Chicago Street Railroad Company, and the certificate, representing the shares, was delivered to the president of the West Chicago Street Railroad Company. An attempt is made to show that these shares were disposed of by the West Chicago Street Railroad Company, and did not pass to the Chicago Union Traction Company. The certificate appears to have been canceled and taken up, and a warrant issued in favor of one F. K. Waller. F. K. Waller, however, was merely the assistant secretary and treasurer of the Chicago Consolidated Traction Company and transfer agent for that company for its stock in New York. The warrant, issued in his favor, was delivered to the president of the West Chicago Street Railroad Company. The proof does not show to whom Waller transferred it. The amount, shown to have been paid by the West Chicago Street Railroad Company for these shares of stock, was the exact amount of the notes held by that company against the three subordinate companies above named; and it is difficult to understand, if the Chicago Consolidated Traction Company bought back these shares of stock from the West Chicago Street Railroad Company with money, why it did not in the first place pay these notes with money, and keep the shares of stock. Instead of doing that, however, it turned over the 4379 shares of stock in return for the notes. The record does not satisfactorily show that these shares were ever disposed of by the West Chicago Street Railroad Company. They appear to have passed with the other property to the Chicago Union Traction Company. It is not shown, and the witnesses cannot say—if there was any purchase of these shares from the West Chicago company—who purchased them.

On May 10, 1899, a long agreement was entered into between the Chicago Consolidated Traction Company, first party, the Chicago West Division Street Railway

Company, second party, the West Chicago Street Railroad Company, third party, the North Chicago City Railway Company, fourth party, and the North Chicago Street Railroad Company, fifth party, wherein it is recited, that the Traction company is the successor and owner of all the railway tracks and rights of the seven subordinate companies above named, and that, prior thereto, said companies had made certain contracts or operating agreements with the said west and north side companies for the operation of cars, etc., and said West and North Chicago companies had made certain contracts or operating agreements with said seven companies above named for the operation of cars over their lines, and wherein it was recited that the seven companies, prior to the transfer to the traction company, and the traction company since said transfer, have been, and are, operating cars over parts of the lines of railroad of the West Chicago company and the North Chicago company without any agreement in writing, and the West Chicago company and North Chicago company have been and are operating cars over the tracks of the traction company without any agreement in writing, and, after making such recitals, it was therein agreed that the traction company should continue to operate its cars and rolling stock over the tracks of the West and North Chicago companies, and the West and North Chicago companies were granted the right to continue to operate their cars over the tracks of the traction company during the entire time the respective companies were authorized to operate and maintain their tracks; and it was agreed that, if any routes should be lost by either party, they should have the same rights of trackage over any substituted routes.   It was also agreed that the cost of the maintenance and repair of any track, used jointly by the traction company with either of the other parties, or of any track of the traction company used jointly by either of the parties with the traction company, should be paid

in proportion as the number of wheel miles run by each of the parties so using was to the total number of wheel miles run by all parties using the same. It was also therein agreed that, in case the traction company should desire to operate its cars over any other track or tracks of the other parties than those thereby granted, for the purpose of completing a route or making a terminal, the right to do so was thereby granted to the traction company upon certain terms. The same right was granted to the West and North Chicago companies, in case they should desire to operate their cars over the tracks of the traction company for the purpose of completing a route or making a terminal. It was therein agreed that the provisions, conditions, requirements and obligations of each of the parties thereto to the others under any written contract prior to that date with reference to the operation of the cars of the respective parties over the tracks of either of the parties, should remain in force for the full term and life of said agreement, and it was also provided that the agreement should inure to and be binding upon the respective successors, lessees and assigns of the parties thereto to the same effect and like import as though the names of the respective successors, lessees and assigns had been named therein and had been parties to the agreement.

This agreement of May 10, 1899, virtually made all the parties thereto one system. This contract of May 10, 1899, gave to the Consolidated company practically unlimited use of all the tracks of the north and west side systems in consideration of which, by the terms of said contract, the Consolidated company was to allow the north and west side companies to use its tracks. The previous agreement of August 4, 1896, granted extensive trackage rights to four of the electric companies over the roads of the North Chicago Street Railroad Company and the West Chicago Street Railroad Company. It thus appears that, before the making of the three agreements

of December 1, 1899, hereinafter mentioned, the appellant
or its lessors and the Consolidated company had each an
equal right to operate cars over the entire combined
system of railroads, and this system was, in its history
and growth, a single unit. Whether this unit was formed
in a strictly legal way by strictly valid means or not, it
is not necessary to inquire in this discussion.

*Third*—As has been before stated, the Chicago Union
Traction Company was organized on May 24, 1899, under
the general Incorporation act of the State. Its state-
ment shows its capital stock to be $32,000,000.00, the
number of shares to be 320,000, the amount of each share
$100.00, and the object, for which it was formed, to be to
construct, own, purchase, acquire and lease street rail-
roads in Chicago and in the counties of Cook, McHenry,
Lake, DuPage and Will, and to operate the said railroads
owned and leased by it with animal, cable, electric or
other power except steam locomotive, etc., the duration
of the corporation to be ninety-nine years. The testimony
shows, that the Chicago Union Traction Company was
organized for the purpose of buying out the North and
West Chicago roads, that is to say, the West Chicago
Street Railroad Company and the North Chicago Street
Railroad Company. Accordingly, on June 1, 1899, about
a week after the organization of the Chicago Union Trac-
tion Company, a lease was made by the West Chicago
Street Railroad Company to the Chicago Union Traction
Company. By the terms of this lease, it was intended
to vest in said Union Traction Company all the property,
rights, privileges and everything of value then vested
in the West Chicago Street Railroad Company, and the
traction company was thereby obligated to assume, carry
out and perform every condition, obligation and cove-
nant, assumed and agreed to be observed and performed
by the said railroad company, and said agreements and
leases were by reference made a part of the lease. Under
the provisions of the lease the Union Traction Company

assumed, and agreed to carry out, all the provisions embodied in the agreements between the West Chicago Street Railroad Company and the seven subordinate companies above mentioned, as said agreements have already been set forth.   By the terms of this lease, the West Chicago Street Railroad Company also granted to the traction company all the railways then owned and operated by the railroad company in Chicago, or that might thereafter be constructed, together with all property, moneys, securities and choses in action, belonging to the railroad company, and all contract and ordinance rights and privileges connected with or relating to the construction, maintenance and operation of the demised railways, or any part thereof, including 7300 shares of the capital stock of the Chicago Passenger Railway Company, and also including 6251 shares of the capital stock of the Chicago West Division Railway Company, subject to a deed of trust securing bonds, amounting to $4,100,000.00.   By the terms of the agreement, the traction company had the right to vote said stock, and do all other things that an absolute owner could do, except sell and assign the same separate from the lease, or vote for an increase thereof; and the traction company was to hold the said property as fully and entirely as the same then were or might thereafter be vested in the said railroad company, its successors or assigns, "saving and reserving, however, the franchise of being a corporation, and every other right or privilege which is or may be necessary to preserve a corporate existence of the railroad company."   The traction company therein agreed to assume all the liabilities of the railroad company, and was entitled to all cash, securities and choses in action in possession of the railroad company, and all receipts from the operation of said railways.   On the same day, to-wit, June 1, 1899, an agreement was executed between the Chicago Consolidated Traction Company and the West Chicago Street Railroad Company, by the terms of

which each company was to use the tracks of the other to get to their shops and barns, and also use the trolley wires and electric currents of the respective companies, and the agreement was to be binding on the lessees of the parties.

Under the broad terms of the lease, the 4379 shares of the stock of the Chicago Consolidated Traction Company unquestionably passed to the Chicago Union Traction Company.

*On December 1, 1899,* three instruments were executed, *first,* an operating agreement between the Chicago Consolidated Traction Company and the Chicago Union Traction Company; *second,* a mortgage executed by the Chicago Consolidated Traction Company to the Equitable Trust Company, and *third,* a trust agreement executed between the Chicago Union Traction Company and the Equitable Trust Company. These three instruments were executed at the same time, and together constitute one transaction. By the terms of the agreement between the Chicago Consolidated Traction Company, called for convenience the "Consolidated Company," as party of the first part, and the Chicago Union Traction Company, called for convenience the "Union Company," as party of the second part, it was recited that the Union company had acquired by leases or contracts, each dated June 1, 1899, from the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, respectively, the right to use the tracks and railroad property of said last two named companies, and also the right to use the tracks and railroad property of the Chicago West Division Railway Company, the Chicago Passenger Railway Company and the North Chicago City Railway Company under certain leases and operating agreements to which reference is made; and it was further recited that, prior to the date thereof, that is, prior to December 1, 1899, under certain contracts to which the Consolidated company, the North Chicago Electric Railway Company,

the Chicago North Shore Street Railway Company, the Chicago Electric Transit Company, the North Side Electric Street Railway Company, the Chicago and Jefferson Urban Transit Company, the Cicero and Proviso Street Railway Company, the Ogden Street Railway Company and the Evanston Electric Railway Company, or some one or more of them, is or are of the one part, and the North Chicago Street Railroad Company, the West Chicago Street Railroad Company, the Chicago West Division Railway Company, the Chicago Passenger Railway Company and the North Chicago City Railway Company, or some one or more of them is or are of the other part, the Consolidated company has been using certain of the railroad tracks and properties controlled by the Union company, and the Union company has been using certain of the railroad tracks and property belonging to the Consolidated company, and the Consolidated company has been furnishing electric current to and receiving electric current from the Union company. It was therein agreed that certain contracts, fourteen in number, hereinbefore set forth, between the original West and North Chicago companies and the various subordinate companies already named should be approved, ratified and confirmed; that certain other contracts, eight in number, also among those hereinbefore set forth, should be modified, and that certain contracts, two in number, should be approved, ratified and confirmed, but their operation suspended, and that one contract, being one of those hereinbefore mentioned, should be modified, and as modified, approved, but the operation suspended during the continuance of said agreement. In other words, this contract of December 1, 1899, substantially ratifies and confirms all the contracts heretofore set forth, as having been made between the North and West Chicago companies and the suburban or extension companies, except that some of them are modified in certain respects, and two or three are suspended as to their operation.

This agreement of December 1, 1899, provides that the Consolidated company during its continuance shall have certain rights of user in the railroad tracks of the Union company, and that transfers shall be given by each company to and from their respective lines at points where their lines connect or intersect. It is also therein agreed, that the Consolidated company shall have the right, free of rental or other charge, to operate its cars on certain lines of railway of the Union company upon certain conditions, and that the Union company shall have the right, free of rental or other charge, to operate its cars on lines of railway of the Consolidated company; and it is also agreed that the Consolidated company, in the operation of its cars, shall be furnished traction by the Union company free of charge; that the Consolidated company shall have the right to collect fares from passengers for transportation in the cars of the Consolidated company, operated over the lines of railway of the Union company, and the Union company shall have the right to collect fares from passengers for transportation in the cars of the Union company operated over the lines of railway of the Consolidated company; that the Consolidated company shall keep careful and correct accounts of the total amount of cash fares it shall have received or collected in the operation of its cars over the lines of railroad of the Union company; that the Consolidated company shall, in the operation of its cars over the lines of railroad of the Union company, whether held by said Union company under lease or otherwise, operate the same, subject to the aforesaid contracts or leases between the West Chicago and North Chicago railroad companies.

*Article 21* of this agreement of December 1, 1899, between the Union company and the Consolidated company provides, that the Consolidated company shall cause to be duly made, executed and delivered a mortgage or deed of trust to the Equitable Trust Company of Chicago,

Illinois, as trustee, upon all its rights, property, real, personal and mixed, ordinances and other grants and privileges, including all its rights and privileges under this agreement, to secure an issue of bonds to the amount of $6,750,000.00 "for its corporate purposes;" said bonds to be of the denomination of $1000.00 each and dated December 1, 1899, the principal payable December 1, 1939, and interest thereon at the rate of four and one-half per centum per annum, payable semi-annually on the first days of June and December each year, the interest to be evidenced by coupons thereto attached; both principal and interest payable in gold coin; said mortgage and bonds to be in such form and contain such terms, conditions and restrictions as the board of directors of the Consolidated company may approve, and shall be made, executed and delivered contemporaneously with this agreement, provided that prior to the actual issue of said bonds and certification of the same, the trustee under said mortgage or deed of trust may issue temporary certificates entitling the holder or holders thereof to said bonds when said bonds shall have been actually issued, certified and delivered to said Union company. It is provided in said article 21 that, when said mortgage has been made and recorded, the Consolidated company shall make, issue and deliver $6,750,000.00 par value of said bonds to the Union company, duly authenticated by said trustee, and the Union company shall place upon said bonds its guaranty of the prompt payment of the principal and interest thereon, when the same shall respectively become due. It is provided by article 23 of the said agreement, that no modification or change of its terms, conditions or provisions shall be made, while said bonds are outstanding or unpaid, except by the written consent of the trustee of the mortgage, securing such bonds, to be given in the manner and under the conditions and restrictions in said mortgage prescribed. Article 24 thereof provides that the agreement shall be binding upon the respective

successors, lessees and assigns of the parties thereto.
By article 25 the duration of the contract is fixed for a
period of fifty years.  By article 27 the parties agree to
execute such further instruments, as may be required to
carry into effect the meaning of the agreement.

The *mortgage*, bearing date December 1, 1899, was exe-
cuted by the Consolidated Traction Company as party of
the first part to the Equitable Trust Company as trus-
tee, party of the second part, wherein, in the recital part
thereof, the agreement between the Consolidated com-
pany and the Union company, already set forth, is re-
ferred to, and wherein a copy of each bond and coupon,
constituting the $6,750,000.00 of bonds, is set forth; and,
after such various recitals, it is therein provided that
the Consolidated company grants to the trust company,
and its successors, all the property, rights, and fran-
chises of the Consolidated company, that is to say, all its
lines of railway and property, rentals, incomes, rights,
privileges, ordinances and franchises, then owned or
thereafter to be acquired by it, and also all its interest
in the operating agreement between the Consolidated
company and the Union company above set forth, and
all the lands and plants, buildings, structures, overhead
construction, power, station houses, work shops, machine
shops, tracks, main lines, branch lines, electrical and
other appliances, equipments, tools, implements, leases,
consents, licenses, rights of any kind, arising under mu-
nicipal ordinances, and contracts with other street rail-
road corporations, and all other property then owned
or thereafter to be acquired by the Consolidated com-
pany, and also all the corporate franchises and corporate
rights, privileges and immunities of the Consolidated
company, and all the rents, incomes and profits of the
Consolidated company, to be held by the trust company
*in trust* for the equal *pro rata* use, benefit and security of
the persons, corporations, firms and partnerships, who
shall hold the said bonds and interest coupons above

mentioned.    And in said mortgage it is agreed between
the parties that the bonds thereby secured shall be au-
thenticated by the trust company and delivered by it
so authenticated to the Consolidated company, or to any
person by the Consolidated company designated to re-
ceive the same upon the written order of the president
of the Consolidated company.    It is also provided in the
mortgage that no bonds shall be deemed as having been
issued or shall be valid for any purpose until the same
have been signed by the president or vice-president of
the Consolidated company and sealed by its corporate
seal certified by the secretary, and shall have been certi-
fied by the trust company to be one of the series of bonds
described therein.    It is also provided in said mortgage
that, in case of default in the payment of the principal
of the bonds or any part thereof, the trust company, on
the written request of a majority of the bondholders,
shall enter into possession and sell the mortgaged prop-
erty at public auction in the manner to be determined
by the trust company.    It is also therein provided that,
for all purposes of title to be conveyed, or sale, the mort-
gage shall be deemed to be an absolute conveyance and
transfer of property to the trust company and the pos-
session of the Consolidated company shall be deemed to
be the possession of the trust company, the proceeds of
the sale after paying costs and expenses, "and all ex-
penses, liabilities, and advances made or incurred by the
trust company in operating and maintaining the prop-
erty conveyed," etc., to be used for the payment of the
principal and interest due upon said bonds.    By the terms
of said agreement the Consolidated company agrees with
the trust company that no amendment or modification of
said operating agreement of the same date shall be made
without the written consent of the trust company, and
the trust company is authorized to give such written con-
sent, in case the security is not thereby impaired or the
purposes of the operating agreement defeated.    The mort-

gage contains other elaborate provisions which it is not necessary here to set forth.

*By the agreement* entered into on December 1, 1899, between the Chicago Union Traction Company as first party, and the Equitable Trust Company, a corporation organized under the laws of Illinois, as second party, it is recited that the Consolidated company and the Union company have, contemporaneously with the execution and delivery of that agreement, made, executed and delivered the operating contract of the same date as herein set forth, and that, in the operating contract, the Consolidated company, in consideration for the rights, privileges and things granted to it under the operating agreement, should cause to be made and executed the bonds and mortgage in question; and it is also recited that the trust company has agreed to act as trustee; and it is therein agreed that, upon the execution and delivery to the Union company by the Chicago Consolidated Traction Company of the bonds mentioned in the operating agreement, amounting to $6,750,000.00, the Union company shall immediately place and execute a guaranty upon each of said bonds. By the *second* section of the agreement the Union company grants, transfers and assigns unto the Equitable Trust Company all said bonds, amounting to $6,750,000.00, guaranteed by the Union company, and secured by said mortgage to the Equitable Trust Company as trustee. By *section 3* of the agreement the trustee is to hold and dispose of the bonds, so sold and delivered to it by the Union company, upon the following uses and trusts, to-wit: *first*, to deliver the same in payment for the capital stock of the Chicago Consolidated Traction Company; *second*, until said bonds shall be delivered by the trustee in payment for the stock of the Consolidated Traction Company, the trustee shall hold said bonds for the use and benefit of the Union company. By the *fourth* section of the agreement the Union company guarantees and agrees, that it will promptly

pay the interest and principal of the said bonds in the manner specified therein. By the *fifth* section it is provided that, in the event that the Union company shall at any time pay any amount in performance of its guaranty on said bonds, the Union company shall not be entitled to have or receive re-payment from the Consolidated company of any such amount, except out of the net earnings of the Consolidated company. By *section 6* of the agreement any holder of shares of the capital stock of the Consolidated company shall have the right to deliver to the trustee certificates, representing their respective shares of stock, duly signed in blank, or in such manner as the trustee shall require, and shall be entitled to receive in payment thereof $1000.00 par value of said bonds for every 22⅔ shares of the par value of $100.00 each of the capital stock of the Consolidated company so delivered, and the trustee is authorized to deliver in payment for said stock said bonds, guaranteed as aforesaid, with the coupons, to the holder or holders so delivering the stock. Any stockholder delivering stock on or prior to May 1, 1900, is entitled to receive interest from December 1, 1899; otherwise interest from the date of delivery. By *section 7*, the trustee is authorized to issue and deliver to stockholders, delivering their certificates, interim certificates, in case the bonds are not actually engraved and delivered to the trustee at the time of the delivery of the capital stock of the Consolidated company. By *section 8* it is provided as follows: "The Union company has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, assign, transfer and set over unto the trust company, as trustee, all and singular the capital stock of the Chicago Consolidated Traction Company, which said trustee shall receive for the bonds aforesaid." By *section 9* all the shares of capital stock of the Consolidated company, which shall be so delivered to the trustee, shall be held by him as security for the pay-

ment of the principal and interest of the bonds. By *section 10*, all the capital stock of the Chicago Consolidated Traction Company, which shall be so delivered and received by said trustee, shall be held and disposed of by him upon certain other trusts, among which are the following: for the equal *pro rata* use and benefit of the persons, becoming the lawful holders of any of said bonds, and, if the Consolidated company, or the Union company, shall pay to the holders of the bonds the principal and interest thereof, etc., the trustee shall immediately deliver all the capital stock of the Consolidated company, so delivered to it, to the several persons, who may be at the time holders or owners of the capital stock of the Chicago Union Traction Company *pro rata*, according to the amount of their respective interests; the shares of capital stock of the Consolidated company, so delivered to the trustee, shall be transferred upon the books of the Consolidated company to the trustee, or to such persons as the trustee shall designate, with the approval of the president for the time being of the Union company; "so long as there shall be no default in the payment of the principal or interest of the bonds, the trustee shall, from time to time, and when, and as requested by the president, for the time being, of the Union company, deliver or cause to be delivered to such person or persons as such president shall designate in writing, a proxy or proxies to vote upon said shares of stock at any and all meetings of the stockholders of the Consolidated company, whether for the purpose of electing directors or otherwise;" it is also agreed that all *dividends* which may be declared upon the stock, deposited with said trustee, shall forthwith be payable to and distributed *pro rata* among the several persons, who may at the time being be stockholders of the Union company, provided there shall be no default in payment of principal and interest upon the bonds, and a list of the stockholders of the Union company, showing the amount of stock held by

them, certified by the secretary or other proper officer of said Union company to be true and correct, shall be conclusive evidence to the trustee of the names of such stockholders. The agreement provides that, in case of default, written notice shall be given to the Union company, before the principal of the bonds is declared to be due. It is also provided that, in case of sale, whatever surplus shall remain, after payment of the bonds and interest thereon, shall be distributed *pro rata* among the holders of the capital stock of the Union company. The agreement also provides that, in case of a resignation of the trustee, or any vacancy in the office of trustee, the office may be filled by the appointment of a new trustee by an instrument executed by the holders of a majority in interest of the bonds, and such instrument shall be delivered to the Union company, and it is provided that the board of directors of the Union company may make a temporary appointment to fill such vacancy.

*Fourth*—The three instruments, thus executed on December 1, 1899, although framed in such a way as to make it appear that the Consolidated Traction Company was paying a consideration to the Union company for certain rights and privileges, really represented the consideration, which the Union company was to pay for the property and assets of the Consolidated company. The Chicago Consolidated Traction Company executed bonds, with interest coupons attached, to the amount of $6,750,-000.00. The payment of both the principal and interest of these bonds was guaranteed by the Union company, and the Union company could only reimburse itself for anything, paid out on account of its guaranty, from the net earnings of the Consolidated company. Really, the obligations, secured by the mortgage or trust deed to the Equitable Trust Company, were the obligations of the Union company rather than of the Consolidated Traction Company. The bonds, amounting to $6,750,000.00, were turned over to the Union company, by whom they were

guaranteed. The Chicago Union Traction Company then delivered all the bonds to the Equitable Trust Company.

What did the Equitable Trust Company do with the bonds in question? The Equitable Trust Company exchanged the bonds for stock of the Consolidated company on behalf of the stockholders of the Union company. The Consolidated company received no money, and, after the bonds had been issued, the Consolidated company stood financially exactly where it stood before their issue. The holders of the stock of the Consolidated company presented their stock to the Equitable Trust Company, and received these bonds in exchange for such stock. 145,322½ shares of this Consolidated stock were received by the Trust company in exchange for bonds of the issue of December 1, 1899. A bond of $1000.00 was exchanged for 22⅔ shares of Consolidated stock surrendered. That is to say, the stock was figured at $45.00 a share, and bonds were issued for it at that rate. The secretary of the Equitable Trust Company says: "The total aggregates 145,322½ shares. When these shares were received by the Trust company, I delivered bonds of the Consolidated Traction Company of the issue of December 1, 1899. We figured the stock at $45.00 a share and then issued bonds for it. We delivered the bonds to the parties named. The bonds were not delivered on the same date that we received the stock. We commenced delivering the bonds about May 2, 1900. They were not ready for delivery until about that time. When a man deposited his stock, we issued an interim certificate, as provided in the trust agreement." When 145,322½ shares of stock were surrendered, less than three per cent thereof was left outstanding, and even a less amount than three per cent was outstanding, if we take into consideration the fact that the Union Traction Company already had 4379 shares of the stock. When the Equitable Trust Company, the trustee selected by both of these parties, received the stock of the Consolidated company, it held it

for the benefit of the stockholders of the Union company. It cannot be doubted that, by the execution of the three instruments of December 1, 1899, and in view of what was done under them as already stated, the Union company actually owned and controlled and dominated the Consolidated Traction Company. There was really and in fact nothing left of the Consolidated Traction Company. It had transferred all its property and franchises, and rights and privileges of every kind to the Equitable Trust Company. It had executed $6,750,000.00 of bonds and passed them over to the Union company, and the Union company was under obligations to see them paid, and no obligation rested upon the Consolidated company to pay them, except so far as its net earnings, or the net earnings of its lines, might be applied to that purpose. The proof shows that the daily receipts of the Consolidated company are collected by the Union company. A special car of the Union company goes the rounds of the various barns, starting early in the morning, and takes up the receipts of the Consolidated company of the previous day in bags, and the bags are delivered to the Union Traction Company's messenger. All the capital stock of the Consolidated company is held by the Equitable Trust Company in trust for the benefit of the stockholders of the Union Traction Company, appellant herein. All the dividends, declared upon the stock of the Consolidated company deposited with the trustee, are distributed *pro rata* among the stockholders of the Union Traction Company, and not among the stockholders of the Consolidated company. The Chicago Consolidated Traction Company has never paid a dividend to the stockholders of that company since the execution of the instruments, dated December 1, 1899. These instruments took the whole plant of the Consolidated company out of its hands, and placed it in the hands of the Union company. By their terms not only was the property of the Consolidated company conveyed to the Union company, but the cor-

porate franchise or charter of the Consolidated company was conveyed to the Union company. The Chicago Consolidated Traction Company thereafter did no business, except such as was necessary to continue its corporate existence. Since that time there has been no meeting of the stockholders of the Consolidated company.

Since that time no regular meeting has been held of the directors of the Chicago Consolidated Traction Company. Certain special meetings were held, at one of which the members of the old board of directors resigned, and new members were elected to fill the vacancies. At another of these special meetings, the employment of the general counsel of the Union company as general counsel of the Consolidated company was authorized, and the employment of the general attorney of the Union company as general attorney of the Consolidated company was authorized. At another of these special meetings the office of second vice-president of the Consolidated company was created, and the private secretary of the president of the Union company was appointed to that office. At another special meeting of the directors the following resolution was adopted:

"*Resolved*, That the president of this company be and he is hereby authorized and directed to fix the salaries of the officers of this company for the current year, and for the past period, commencing with the election of the present board of directors, which occurred on the 17th day of May, A. D. 1900, and the action of the president in that regard shall be final without further reference to the board of directors."

The same individual was president of the Chicago Union Traction Company, and also of the Chicago Consolidated Traction Company. In other words, both companies had the same president. It thus appears that the president of the Union Traction Company had the power to fix the salaries of all the officers of the Consolidated Traction Company. The voting power of the stockholders of the Consolidated Traction Company was really

vested in the president of the Union Traction Company.
The trust agreement of December 1, 1899, provides that
the trustee, the Equitable Trust Company, shall, from
time to time, and when, and as requested by the presi-
dent of the Union Traction Company, deliver to such
persons, as the president of the Union Traction Company
shall designate in writing, a proxy or proxies to vote up-
on the shares of the stockholders of the Consolidated
company, whether for the purpose of electing directors
or otherwise. Thus, the president of the Union company,
by his written request to the trustee, has the power to
designate the persons, who are allowed to vote upon the
shares of stock of the Consolidated company. Could the
control of the Chicago Union Traction Company over
the Chicago Consolidated Traction Company be made
more complete than by such an arrangement as this? All
the officers of the Consolidated company, including the
board of directors themselves, hold their offices at the
will and pleasure of the president of the Union company.
The latter can arrange the business of the Consolidated
company at his own pleasure, including the operation
and management of the road. The only restriction upon
the power of the president of the Union company over
the Consolidated company is the control, which may be
exercised over him by the board of directors of the Union
company. The board of directors of the latter company
are supposed to meet every three months.

Not only do these two companies, the appellant com-
pany and the Chicago Consolidated Traction Company,
have the same president, but they have the same counsel,
and they have the same attorney, and the same auditor,
and the same claim agent, and the same engineer; and
all the officers of the two companies have their offices at
the same place, to-wit, in a building owned by the Union
Traction Company, or one of its lessors. The attorney,
who acts as general attorney for both the Union com-
pany and the Consolidated company, is president of all

the seven subordinate companies. The man, who acts as superintendent of the Consolidated Traction Company, states that he is employed by John M. Roach, the president of the Union Traction Company, and he has his office at the same place with the man, who is the general superintendent of the Union Traction Company. The two companies borrow cars of each other, and shift about the men employed by them respectively, whenever it suits their convenience, and is necessary to the operation of all the lines of the two companies. No charge is made by one company against the other for the use of cars. A majority of the board of directors of the Consolidated company are in the service of the Union company. The two companies have the same surgeon to attend upon persons injured by accident. Two checks, drawn for the payment of license fees due from the Consolidated company, are shown to have been paid out of the funds belonging to the Union Traction Company. The Union company advances money from time to time to the Consolidated company to carry on its business. The following statement is made in the testimony of the secretary and treasurer of the Consolidated Traction Company, to-wit: "The accounts for power, furnished between the Union company and the Consolidated company, are made in the auditor's office. Mr. Smith, the auditor, makes out the bill against the Consolidated Traction Company, presents it to the president of the Consolidated for approval. It is the duty of the auditor of the Consolidated to approve that bill as to its correctness. As auditor of one company he makes out the bill, and, as auditor of the other, he examines to see whether it is correct or not. He then makes a voucher in favor of the Union company, and presents it to Mr. Roach as president of the Consolidated, and Roach O. K.'s and hands it to me, as secretary of the Consolidated, and I pay it." Mr. Smith says: "I began to act as auditor of the Consolidated company April 16, 1899. The board of directors made me auditor

of the Union company.    Mr. Roach made me auditor of
the Consolidated company April 16, 1900.    I had a great
deal to do at that time for the Union company.    *    *    *
The salary I have received as auditor of the Consolidated
is only a small part of my compensation.    I have drawn
my greatest salary from the Union company.    I receive
my instructions from Mr. Roach." Smith is not only aud-
itor of the Chicago Union Traction Company and of the
Chicago Consolidated Traction Company, but is secre-
tary of the West Chicago Street Railroad Company, the
North Chicago Street Railroad Company, the Chicago
Passenger Railway Company, and assistant secretary of
the Chicago West Division Railway Company.

The requirement, embodied in section 1723, is imposed
upon the street railroad companies therein specified by
reason of their public character, and by reason of the
fact that they are engaged in a public occupation, which
permits them to use the streets and highways of the
people.    The duty to give the transfer tickets, therein
required, is a duty, which arises out of the public char-
acter of their business.    This duty rests not merely upon
the technical owner, but upon the real, beneficial owner,
and, in this case, it cannot be doubted that the Chicago
Union Traction Company is the beneficial owner.    It is
well said by one of the counsel for the city in this case:
"A corporation could not avoid its duties to give trans-
fers from one line to a connecting line by conveying to
another corporation a dry legal title to one of the lines,
and it is submitted that it is equally impossible to do so
by leaving a dry legal title in the hands of the corpora-
tion, from which it purchased a connecting line." Where
the duty of a public service corporation to the public is
to be determined, the substance of things will be looked
to, and consideration should not be given to mere corpo-
rate fictions.

Where a company is organized to build and operate
an extension of a railroad system, such company will be

regarded as but the instrument of such system to carry
on its business, where the stock is all placed in the names
of employes of the old corporation, the principal offices
of the new corporation are filled by officers of the old
one, the old corporation purchases bonds of the new one
to construct its road, and furnishes the rolling stock, a
traffic agreement is made, by which the new corporation
is to work for the old one for a long period of time, the
benefit of which is to pass with the sale or mortgage of
the property of the old one, and the operating divisions
of the road show a single system of management. (*Buie* v.
*Chicago, Rock Island and Pacific Railway Co.* 55 L. R. A. 861).
In *Buie* v. *Chicago, Rock Island and Pacific Railway Co. supra*,
the Supreme Court of Texas say: "In answer to a simi-
lar proposition the court of appeals of the State of New
York said: 'We have of late refused to be always and
utterly trammeled by the logic derived from corporate ex-
istence where it only serves to distort or hide the truth.'
This court has always refused to be controlled by tech-
nicalities when interposed to prevent an investigation
into the real facts of a case. Courts will look beneath
the masque of legal forms for the real facts of any trans-
action presented to them for investigation. The law-
fulness of this transaction is not now before the court.
*  *  *  It would be willful blindness, if we failed to see
through the masque of legal forms, that the stock, placed
in the names of the employes of the Pacific company,
was really owned by that company.  *  *  *  The organi-
zation of the sub-corporation supports this view. The
limited number of stockholders, and placing the stock
in the names of persons under the control of the Pacific
company, followed by the selection of the attorney and
employes of the foreign company to the four principal
offices of the new corporation, strongly indicate that, in
controlling the business, the Pacific company provided
the mastery for itself.  *  *  *  Holding the stock and
the bonds, the foreign company was in fact possessed of

all the power that resided in the corporation, and exercised it through officers selected from among those known to be in its interest. * * * The subsequent operation and management of the railroad is consistent only with the idea that the corporations are one and indivisible in their every interest. * * * If we view these corporations from any standpoint, it will be difficult to distinguish their corporate powers, management or officers, so as to ascribe any function of corporate control to the Texas company, and we conclude that the Texas company is but the instrument used by the Rock Island and Pacific Company to carry on its business in Texas."

In *Stockton* v. *Central Railroad Co.* 50 N. J. Eq. 74, the court say: "But more than this, the Port Reading Railroad Company is, for all substantial purposes, the Philadelphia and Reading Railroad Company. It is confessedly owned by individuals, who represent and serve the Philadelphia and Reading. Its capital stock, save a few shares, has gone, or is to go, to a construction company, which unquestionably belongs to the same interest. The construction company is officered by the servants of the Philadelphia and Reading Railroad Company. It has commenced work with an insignificant paid capital—$2000—and it has confessedly drawn moneys from the Philadelphia and Reading railroad to enable it to build the Port Reading road. The business offices of both the Port Reading railroad and the Port Reading Construction Company are identical with the principal office of the Philadelphia and Reading Railroad Company. A glance at the execution of the guaranty exhibits that the same individuals are president and secretary of both the Port Reading Railroad Company and the Philadelphia and Reading Railroad Company. * * * In the face of such a situation, it is idle to say that the Port Reading Railroad Company is not in all things, save in its intangible and unsubstantial corporate entity, the Philadelphia and Reading Railroad Company. It is only necessary to state

these particulars to satisfy the mind of the justice of this conclusion.  Says Mr. Morawetz in his work on Corporations (sec. 227): 'The statement, that a corporation is an artificial entity apart from its members, is merely a description in figurative language of a corporation viewed as a collective body.  A corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact.'  'It is a certain rule,' said Lord Mansfield in *Johnson* v. *Smith*, 2 Burr. 962, 'that a fiction of law shall never be contradicted so as to defeat the end for which it was invented, but for every other purpose it may be contradicted.'  It follows from the conclusion reached, that the intervention of the Port Reading company as nominal lessee is but a device to disguise the real nature of the transaction.  It is demonstrated as clearly as words could state it, that the object of the transaction was to place the Central railroad within the Philadelphia and Reading railroad system.  The Central's reliance was not upon the small unfinished road, with a comparatively petty capital and little or no valuable assets, but upon the Philadelphia and Reading Railroad Company that estimated its assets at $200,000,000.  It is sticking in the bark to say that, in this transaction, the Philadelphia and Reading Railroad Company is not the real lessee, and that the guaranty, executed by it, is not the real lease.  The misnomer of papers, and the use of a nominal entity as nominal lessee, does not change the substance of the transaction with which this court deals.  The situation here may be summed up in the words of Vice-Chancellor Kindersley in *Attorney General* v. *Great Northern Railway Co.* 1 Drew & S. 157, 6 Jur. (N. S.) 1006, 29 L. J. 794: 'A more flimsy device, when the particulars are once known, it is impossible to imagine.  It may succeed for a time in baffling persons, who may have an interest in preventing its being done and has succeeded, but it was a mere crafty contrivance to evade the requisition of the law on the subject of joint stock companies.'

It must not be thought that courts are powerless to strip off disguises that are designed to thwart the purposes of the law. The mere suggestion of such a condition is an insult to the intelligence of the judiciary. Whenever such disguises are made apparent they can readily be disrobed. The difficulty is in showing the disguises, not in penetrating them when they appear." In the same case, to-wit, *Stockton* v. *Central Railroad Co.* 50 N. J. Eq. 489, when it came before the court a second time, the chancellor said (at page 497): "In my former opinion in this case, I declared that, for the substantial purposes of injury to the public by combination to stifle competition, and the Attorney General's suit to defeat such combination, the defendants are to be regarded in equity as the owners of the coal mines; not as holders of the legal title, but as having substantial control of the corporate entities which hold that title. It was made quite apparent to me, that the relation of the coal companies to the railroad companies is such that the same minds and wills, which dictate the policy of the railroads, and decide what they shall do and what they shall not do, also, in virtue of the power given by the ownership of a majority of the stock of the two coal companies, which is the property of the defendants, dictate the policy and control the conduct of the coal companies; that the defendant railroad corporations and the two coal companies are, in short, guided, dominated and controlled by precisely the same governing power."

So, in the case at bar, while the Chicago Consolidated Traction Company may, as a legal entity, have a separate corporate existence, there is no doubt, in view of the evidence in this record, that it is guided, dominated and controlled by the Chicago Union Traction Company as a governing power, so as to come within the meaning of the language used in section 1723.

The question, whether it is legal or not for one corporation to own stock in another corporation, need not be

re-discussed in this case. (*People* v. *Chicago Gas Trust Co.* 130 Ill. 268). It is sufficient to say, that all the stock of the Chicago Consolidated Traction Company was passed over into the hands of the Equitable Trust Company, as trustee, in exchange for an issue of bonds, and to be held by said trustee for the benefit of the stockholders of the Chicago Union Traction Company. From the control, which the Chicago Union Traction Company, by virtue of the papers executed on December 1, 1899, acquired over the stock and the stockholders of the Chicago Consolidated Traction Company, it virtually acquired the control over that company itself. In *People* v. *Chicago Gas Trust Co.* 130 Ill. 268, we said (p. 291): "The sixth section of the general Incorporation act provides that the corporate powers shall be exercised by a board of directors or managers, and that the number of such directors or managers, and their terms of office, shall depend upon 'the consent of the owners of a majority of the shares of stock.' It cannot be denied that the appellee, as owner of the majority of the shares of stock of these four companies, can control them, in the exercise of all their corporate powers, through a board of managers of its own selection. In *Weidenger* v. *Spruance*, 101 Ill. 278, this court, speaking through Mr. Justice SCHOLFIELD, said: 'The stockholders elect the directors, and, through them, carry into effect the corporate functions. Presumably, the directors act in obedience to the aggregate wishes of the stockholders.'—*Milbank* v. *New York, Lake Erie and Western Railroad Co.* 64 How. (N. Y. Rep.) 29." (See also *Distilling and Cattle Feeding Co.* v. *People*, 156 Ill. 448; *Bishop* v. *American Preservers' Co.* 157 id. 284; *Exchange Bank* v. *Macon Construction Co.* 97 Ga. 1).

Counsel for appellant refer to some cases, which appear to hold contrary views to those herein expressed. Some of these cases are based upon statutory provisions in force in the States where they were decided. All of them appear to be cases where individuals or corpora-

tions had entered into contracts with another corpora-
tion, and were seeking to enforce contract rights against
the latter corporation.  Where a party is seeking to en-
force his rights under a contract with a corporation, he
must recognize the technical legal existence of such cor-
poration.  In the case at bar, the city of Chicago is not
seeking to enforce any contract with appellant, but is
seeking to enforce against it the performance of a duty
which it owes to the public; and that duty arises under
a general ordinance, passed by the city council in the ex-
ercise of its legislative authority.  Corporate forms and
fictions cannot be used to evade public duties.

The main case relied upon by appellant is that of
*Pullman Car Co.* v. *Missouri Pacific Co.* 115 U. S. 587.  An ex-
amination of the latter case, however, will show that its
facts are materially different from the facts in the case
at bar.  The *Pullman case* was a suit in equity, brought
by Pullman's Palace Car Company to enjoin the Missouri
Pacific Railway Company and the St. Louis, Iron Moun-
tain and Southern Railway Company from discontinuing
the use of the sleeping cars of the complainant on the
line of the latter company.  The trial court dismissed the
bill on a demurrer, and from such decree of dismissal
an appeal was taken.  In that case, a contract had been·
made with the Missouri Pacific company by the Pull-
man company for hauling sleeping cars of the Pullman
company on the passenger trains of the Missouri Pacific
company under its control.  Afterwards the St. Louis,
Iron Mountain and Southern Railway Company which,
as well as the Missouri Pacific Railway Company, was
a corporation organized under the laws of Missouri, was
consolidated or absorbed by the latter company.  It was
held in that case that, under the laws of Missouri, where
a number of companies were consolidated, the old corpo-
rations so consolidated were actually dissolved, and the
corporation resulting from the consolidation was a new
corporation.  In other words, the Missouri Pacific com-

pany, after it had acquired a majority of the stock of the St. Louis, Iron Mountain and Southern Railway Company, and had also acquired other companies, was itself a new company, although retaining the same name, and that, therefore, the contract, made with the Missouri Pacific Railway Company before the consolidation, was a contract made with another and different company from that which existed under the same name after the consolidation. The contract there was also construed by the court to refer to the control of the old Missouri Pacific Railway Company over the roads owned or controlled by it at the time of the consolidation, and not to other roads thereafter acquired by the new company resulting from the consolidation. Upon the grounds thus stated, it was held that the new Missouri Pacific company, resulting from the consolidation, was not required by the contract of the old company to haul the Pullman cars on the road of the St. Louis, Iron Mountain and Southern company, even if, after the consolidation, it controlled the latter road within the meaning of the contract. It is to be observed, however, in the case at bar, that the language of section 1723, is different from the language of the contract under consideration in the *Pullman case*. In the latter case, the contract referred to the control of the old company over other companies, and to such other companies as were actually under the control of the old company. Here, that part of the ordinance, which concerns transfer tickets, refers to any line of street railway, not merely controlled, but "owned, leased or operated" by any person, firm or corporation. Ownership is sufficient under the terms of section 1723, even though that ownership should be passive, and not accompanied by actual control. In addition to this, in the *Pullman case* the Missouri Pacific Railway Company acquired, and became the owner of, more than a majority of the stock of the St. Louis, Iron Mountain and Southern Railway Company, and it was a part of the arrange-

ment that the stockholders of the latter company should not divest themselves altogether of their interest in its franchise, property and business, but should place the same under the control and management of the Missouri Pacific Railway Company by the transfer of their stock in the St. Louis, Iron Mountain and Southern Railway Company to the Missouri Pacific Railway Company, and retain their interest therein by receiving in exchange therefor the stock of the Missouri Pacific Railway Company in certain proportions; and it was understood, as a part of the arrangement, that the stock of the Missouri Pacific Railway Company, received in exchange for the stock of the St. Louis, Iron Mountain and Southern Railway Company, would represent, in the hands of its holders, a combined interest in the properties of both of said corporations.   No such facts exist in the case at bar.

The stock of the Chicago Consolidated Traction Company was not exchanged for the stock of the Chicago Union Traction Company, nor did the latter merely become an owner of the majority of the stock of the former. But the stock of the Chicago Consolidated Traction Company was given up and surrendered to the trustee, in exchange, not for stock of the Chicago Union Traction Company, but for bonds executed by the Consolidated company itself, and guaranteed by the Union Traction Company.   Here, there was not an exchange of stocks between the Union and the Consolidated companies, but an actual sale of the stock of the latter company for bonds guaranteed by the former company.   The stock of the Consolidated company was surrendered to the trustee, and held for the benefit of the stockholders of the Union company, but the voting power was vested in the president of the Union company.   No voting was to be done by the stockholders of the Consolidated company, but the trustee, to-wit, the Equitable Trust Company, was required, at the time when it was requested by the president of the Union company, and in such manner as

it was requested by the president of the Union company, to deliver to such persons, as such president should designate in writing, proxies to vote upon the shares of stock of the Consolidated company. The original holders of the stock of the Consolidated company, who had surrendered it and taken these bonds therefor, were not authorized to vote upon the stock either for directors or otherwise, but such persons, as the trustee, under the direction of the president of the Union company, should direct to vote, were required to vote. These facts constituted the Union company in truth and in fact the beneficial owner of the Consolidated company. It was said by the court in the *Pullman case* that, under the state of facts there existing, the Missouri Pacific Railway Company had all the advantages of the control of the St. Louis, Iron Mountain and Southern Company, and might control the latter. It is true, as a general thing, that, although the stockholders are the owners of the property of a corporation, yet the board of directors elected by the stockholders are in the immediate management of its business and in the immediate control of its affairs, but, here, the only persons, who were to have any voice in the control and management of the affairs of the Consolidated company, were such persons as acted under proxies, received by the trustee under the direction of the president of the Union company. We are, therefore, of the opinion that the *Pullman case* is not a controlling authority in opposition to the views herein expressed. We hold that the Consolidated company bears such a relation to appellant as to make the two companies come within the meaning of section 1723, so far as transfer tickets are concerned.

*Fifth*—The second question above referred to relates to the reasonableness or unreasonableness of section 1723, as an ordinance regulating rates of fare. It is claimed by the appellant that the ordinance is unreasonable, upon the alleged ground that its enforcement so reduces

the earnings or profits of the appellant, as to amount to a taking of its property for public use without just compensation, or without due process of law.

Upon this subject we refer to, and repeat, the views expressed at the close of the opinion in *Chicago Union Traction Co.* v. *City of Chicago*, (*ante*, p. 484.) There is no testimony in the record, showing what the earnings or profits of the Union Traction Company, or of its lessors, the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, are, or have been since the Union Traction Company was organized.

The rate of fare, prescribed in section 1723, will be presumed to be reasonable, until its unreasonableness is shown, and the burden of showing the rate to be unreasonable rests upon the appellant. In *Cotting* v. *Kansas City Stock Yards Co.* 183 U. S. 97, the Supreme Court of the United States, speaking through Mr. Justice Brewer, said: "Its (the legislature's) prescription of rates is *prima facie* evidence of their reasonableness. In other words, it is a legislative declaration that such charges are reasonable compensation for the services rendered." (See also *Capital City Gas Light Co.* v. *City of DesMoines*, 72 Fed. Rep. 840; *Atlantic and Pacific Railway Co.* v. *United States*, 76 id. 190; *Chicago, Burlington and Quincy Railroad Co.* v. *Jones*, 149 Ill. 361).

It is true that there is much testimony in the record as to the profits and earnings of the Chicago Consolidated Traction Company. Even if this testimony was sufficient upon this branch of the case, it shows a reasonable profit on the part of the Consolidated company, and, therefore, that the ordinance is not unreasonable in the respect charged. A railroad company is not entitled to exact such charges for transportation, as will enable it at all times not only to pay operating expenses, but to meet the interest regularly accruing upon all its outstanding obligations, and justify a dividend upon all its stock. (*Smyth* v. *Ames*, 169 U. S. 524). The accounts, sub-

mitted by appellant in its testimony, are based upon the theory that the Consolidated company is entitled to maintain rates or charges for transportation of passengers adequate to all the ends thus specified; and it is claimed that, because it is prohibited from maintaining such rates or charges, it is deprived of its property without due process of law, and is denied the equal protection of the laws. In *San Diego Land and Town Co.* v. *National City*, 174 U. S. 755, in an opinion delivered by Mr. Justice Harlan, the Supreme Court of the United States held that a railroad company, maintaining a highway under the authority of the State, cannot fix its rates with a view solely to its own interest and ignore the rights of the public, and that "the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public, or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders." It was further said in that case: "If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates, as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitalization; and the apparent value of the property and franchises used by the corporation, as represented by its stocks, bonds, and obligations, is not alone to be considered when determining the rates that may be reasonably charged." It was also held in that case that the basis of all calculation as to the reasonableness of rates to be charged by a corporation, maintaining a highway under legislative sanction, must be the fair value of the property used by it for the convenience of the public, and that "what the company is entitled to demand, in order that it may have just com-

pensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." It is also there held that "what the public is entitled to demand is, that no more be exacted from it for the use of the public highway than the services rendered by it are reasonably worth." In that case, it is also said that, in order to ascertain such fair value of the property, the original cost of construction, and the present cost, as compared with such original cost of construction, may be taken into consideration.. The views thus expressed are peculiarly applicable to the testimony found in this record in regard to the earnings or profits of the Chicago Consolidated Traction Company.

It is claimed by the appellant, that the testimony shows a deficit of between $400,000.00 and $500,000.00, but this deficit, if it exists, is made up almost entirely of interest paid on the bonds amounting to $6,750,000.00 already mentioned; $506,250.00 is charged as having been paid for interest to the holders of coupons, attached to these bonds, for the period ending December 31, 1901. There would have been no deficit, if those bonds had not been issued, and the mortgage to secure them had not been executed. The Consolidated company received no money for the issuance of these bonds. They were exchanged for its stock. Whether the stock of the Chicago Consolidated Traction Company was turned over, before its subsequent surrender to the Equitable Trust Company, to the stockholders of the seven suburban or underlying companies as a gift, or in exchange for the stock of such suburban companies, it did not represent a single dollar of original investment; and, consequently, the changing of the stock into bonds did not increase the capital actually invested in the road. Hence, it is a serious question whether the interest paid out upon these bonds could be properly and legitimately charged as an item of expense. If the original cost of the roads of the suburban companies be compared with their present

value, the Consolidated company, if it is to be considered as a separate company, has made a large profit instead of a loss.

It may be said here, as was said in the other case of *Chicago Union Traction Co.* v. *City of Chicago,* (ante, p. 484,) that a reduction of rates might have the effect of increasing the amount of business and earnings of the appellant, instead of decreasing the same. A public service corporation is entitled at the very most only to a profit on the actual investment; (*Cotting* v. *Kansas City Stock Yards Co. supra;*) and, here, the Consolidated Traction Company has made a profit on its actual investment.

One of the methods of determining what is a reasonable rate of fare, or charge for transportation, is to show that other companies of a similar character charge the same rate for transportation for the same or for a longer distance. In the case at bar, it was proven that the Chicago City Railway Company, whose lines run in the south division of the city, charges the same rate exacted of the appellant for even longer rides than the appellant gives to its passengers. In regard to this road the following testimony was given: "The Chicago City Railway Company gives transfers at intersecting points where the roads cross each other. They also give transfers where the lines join; where one line ceases and another continues on the same street. We give such transfers for a continuation of the ride. The longest ride on the payment of one fare and a single transfer would be between fifteen and sixteen miles. * * * We have been using this system of transfers for a good many years." In *Cotting* v. *Kansas City Stock Yards Co. supra,* it was said: "It was found, however, that the charges made by the defendant were no greater (and in many instances, less) than those of any other stock yards in the country. Nothing is stated to outweigh the significance of that finding. While custom is not controlling, for there may be a custom on the part of all stock yards companies to make excessive

charges, yet, in the absence of testimony to the contrary, a customary charge should be regarded as reasonable and rightful. In Gunning, on Law of Tolls, the author says (p. 61): 'Long usage and acquiescence in one uniform payment for toll is undoubtedly cogent evidence that it is reasonable.'" (*Louisville, Evansville and St. Louis Railroad Co.* v. *Wilson*, 119 Ind. 358). In the latter case the Supreme Court of Indiana said: "The law makes it the duty of every common carrier to receive and carry all goods, * * * and authorizes a reasonable reward to be charged for the service. The amount to be paid is, in a measure, subject to the agreement of the parties; but when the amount is not fixed by contract, the law implies that the carrier shall have a reasonable reward, which is to be ascertained by the amount commonly or customarily paid for other like services.—*Johnson* v. *Pensacola and P. R. R. Co.* 16 Fla. 623; Angell, Carriers, sec. 392; Lawson, Contracts of Carriers, sec. 125."

But whether the proof does or does not show, that the charge of the rate, required by section 1723, causes no unreasonable reduction in the profits or earnings of the Chicago Consolidated Traction Company, is entirely immaterial in this case, as the record now stands. These actions here under consideration are brought against the Chicago Union Traction Company. The enforcement of section 1723 is against the appellant, and not against the Chicago Consolidated Traction Company. It was, therefore, incumbent upon the appellant to show that the enforcement of the ordinance operated to make an unreasonable reduction in the profits or earnings of the appellant. No evidence, however, has been introduced to show the earnings of the Union Traction Company as a company, except so far as the lines embraced in the Chicago Consolidated Traction Company are a part of the lines of the Union Traction Company. But all the lines of the original lessor companies, to-wit, the West Chicago Street Railroad Company and the North Chicago

Street Railroad Company, are embraced within the Union Traction Company; and no testimony is shown as to the earnings or profits of these latter companies.

If the Chicago Consolidated Traction Company is a separate company from the Chicago Union Traction Company, as is contended by the appellant, then testimony as to the profits or earnings of the former company can not show any reduction in the profits or earnings of the latter company. Upon the theory that the two companies are entirely separate, the testimony does not concern the company against whom these actions are brought.

But if, as this opinion holds, the Chicago Consolidated Traction Company is merely a part of the Chicago Union Traction Company, and owned and operated by the latter company, then it was necessary to show the profits and earnings of the whole system of railways, embraced within the Chicago Union Traction Company, and the effect of the enforcement of the ordinance upon all the lines embraced within the whole system. Evidence of the earnings or expenses of a single mile or division of a system of railways is inadmissible to prove that a rate, fixed by legislation, is unreasonable.

In *St. Louis and Santa Fe Railway Co.* v. *Gill*, 156 U. S. 665, the Supreme Court of the United States, speaking through Mr. Justice Shiras, said: "It, therefore, appears that the allegations made and the evidence offered did not cover the company's railroad as an entirety even in the State of Arkansas, but were made in reference to that portion of the road originally belonging to the St. Louis, Arkansas and Texas railway, and extending from the northern boundary of Arkansas to Fayetteville, in said State. In this state of facts we agree with the views of the Supreme Court of Arkansas, as disclosed in the opinion contained in the record, and which were to the effect, that the correct test was as to the effect of the act on the defendant's entire line, and not upon that part which was formerly a part of one of the consolidating roads;

that the company cannot claim the right to earn a net profit from every mile, section, or other part, into which the road might be divided, nor attack as unjust a regulation which fixed a rate at which some such part would be unremunerative; that it would be practically impossible to ascertain in what proportion the several parts should share with others in the expenses and receipts in which they participated; and, finally, that, to the extent that the question of injustice is to be determined by the effects of the act upon the earnings of the company, the earnings of the entire line must be estimated as against all its legitimate expenses under the operation of the act within the limits of the State of Arkansas."

The views here expressed are precisely applicable to the facts in the case at bar. Appellant should have introduced proof as to the earnings of its entire line, including its original lessor companies as well as the Consolidated company, so that such earnings of the entire line might be estimated as against all the legitimate expenses of such entire line. No such proof is in the record. (See also *St. John* v.*Erie Railway Co.* 22 Wall. 136). In *People* v. *St. Louis, Alton and Terre Haute Railroad Co.* 176 Ill. 512, we held that the sufficiency of the earnings of a railroad to justify the expense of running a separate passenger train over a certain branch line, constituting part of the entire system, is not to be determined by considering the profits of that branch alone, but of the whole business of the various parts of the road operated with the branch as one continuous line.

We are of the opinion, that the enforcement of the ordinance here under consideration, over the lines of the appellant as one system of railway, will not so reduce its earnings or profits as to constitute a taking of its property without due process of law.

The judgments of the criminal court of Cook county in the eight cases here considered are affirmed.

*Judgment affirmed.*